754 F.2d 573
 53 USLW 2472, 17 Fed. R. Evid. Serv. 837
 Mary Lou Clark DIXON, Administratrix of the Estate of
Charlie Dixon and Mary Lou Clark Dixon,
Individually, Plaintiff-Appellant Cross-Appellee,
International Paper Company, a foreign corporation,
Intervenor-Appellant Cross-Appellee,
v.
INTERNATIONAL HARVESTER COMPANY, Defendant-Appellee Cross-Appellant.
 No. 83-4364.
 United States Court of Appeals,
Fifth Circuit.
 March 7, 1985.
 
 Maples & Lomax, F. Gerald Maples, Pascagoula, Miss., for Dixon.
 Aultman & Aultman, James D. Johnson, Louie F. Ruffin, Hattiesburg, Miss., Ransom P. Jones, III, Pascagoula, Miss., for Intern. Paper.
 Heidelberg, Woodliff & Franks, W. Swan Yerger, David W. Dogan, III, Jackson, Miss., for Intern. Harvester.
 Appeals from the United States District Court for the Southern District of Mississippi.
 Before WISDOM, RANDALL and JOLLY, Circuit Judges.
 E. GRADY JOLLY, Circuit Judge:
 
 
 1
 In this Mississippi products liability diversity action the plaintiff was injured by a pine sapling that entered the cab of the crawler tractor he was driving. He brought suit against the tractor manufacturer alleging defective design under strict liability principles, and negligent design. After trial, the jury returned a verdict for the plaintiff but the district court rendered judgment notwithstanding the verdict. The plaintiff on appeal seeks reinstatement of the jury verdict arguing that there is sufficient evidence to support the verdict. The defendant cross-appeals, contending that the damage award is excessive, the district court committed evidentiary errors, and the court erred in denying its alternative motion for new trial based upon insufficiency of the evidence. The plaintiff's employer, who intervened at trial, appeals, seeking reimbursement of workmen's compensation benefits paid to the plaintiff. We hold that the district court erred in rendering judgment notwithstanding the verdict. We therefore reinstate the jury verdict on liability, but because the jury's assessment of damages is excessive, offer the plaintiff a remittitur of the award or a new trial on damages. We also hold that the plaintiff's employer is entitled to recover the workmen's compensation benefits that it paid to the plaintiff.
 
 I.
 
 2
 The accident occurred when Charlie Dixon, an employee of International Paper Company, was plowing fire lanes on April 22, 1980, on a tractor (TD7C) manufactured by the defendant, International Harvester Company (Harvester). Dixon was operating the tractor on International Paper land, recently ravaged by a hurricane, in George County, Mississippi. The hurricane had overturned many trees and saplings, leaving them protruding from the ground at various angles. While Dixon was running the tractor at approximately two miles an hour, a tree sapling, about two inches in diameter at its tip, entered the lower left front of the tractor cab through an open area between a support bar and the dashboard. The sapling speared Dixon in the abdomen and pinned him into the upper right-hand corner of the cab where he remained for approximately thirty-five to forty minutes.
 
 
 3
 Dixon had been operating the cab for over an hour prior to the accident when Ottis Davis, a co-worker, heard a tractor idling high, and suspected there might be a problem. When Davis investigated and found Dixon pinned inside the tractor, he returned to the Pine Level Station, the International Paper area headquarters, to radio for help. The other co-workers who were dispatched to extricate Dixon used a power saw to cut the tree inside and outside the cab to free him.
 
 
 4
 Dixon was taken by ambulance to the George County Hospital where he received emergency care and then was transferred to the Singing River Hospital in Pascagoula, Mississippi, for further treatment. After several operations and a lengthy rehabilitation period, he returned to work at the Pine Level Station on January 2, 1981, where he continued to work until October 19, 1981. Dixon quit his job when he was diagnosed as having cancer of the prostate, a condition wholly unrelated to the accident. He died from the cancer on November 22, 1982, approximately two and one-half years after the accident.
 
 
 5
 Before Dixon died, he and his wife, the plaintiff Mary Lou Clark Dixon, brought this personal injury suit against Harvester, and after Dixon's death the action was revived by Mrs. Dixon in her individual capacity and as administratrix of Dixon's estate.[1] Mrs. Dixon seeks to recover damages against Harvester under the strict liability theory of defective design or the alternative theory of negligent design for Dixon's personal injuries and damages resulting to herself. The case was tried before a jury, which found Harvester liable and awarded Mrs. Dixon actual damages of $2,821,871.64. The district court entered final judgment on the jury verdict and also held that the intervenor, International Paper, was entitled to full reimbursement of the $43,916.79 that it had paid to Dixon as workmen's compensation benefits.
 
 
 6
 Harvester then filed a motion for judgment notwithstanding the verdict and a new trial. The district court denied Harvester's request for a new trial but granted its motion for judgment notwithstanding the verdict. Mrs. Dixon and Harvester both appeal. International Paper also appeals seeking reimbursement for its workmen's compensation payments to Dixon in the event the jury verdict is reinstated.
 
 II.
 
 7
 The basic facts in this products liability case are not in dispute. The parties agree that Dixon was injured while driving a Harvester-manufactured tractor and that he received severe and painful injuries. The major disputed issue is whether the tractor was defectively designed for strict liability purposes, or was negligently designed. Harvester argues that there was insufficient evidence to support a finding of liability under either of the asserted theories, and therefore the district court properly overturned the jury verdict. Harvester, however, contends that the district court erred in denying its motion for a new trial because: (1) several evidentiary errors were committed; (2) the court and plaintiff's counsel made improper comments in the jury's presence; (3) the damage award was excessive; and (4) the verdict was against the great weight of the evidence. Mrs. Dixon simply contends that she presented substantial evidence to support the jury's finding that the tractor was defectively and negligently designed, that the district court committed no error requiring a new trial, and that the damage award was not excessive. In addressing these contentions, we turn first to the contested evidentiary rulings.
 
 III.
 A.
 
 8
 The first contested ruling of the district court concerns the admissibility of the testimony of Mrs. Dixon's expert witness, Stephen Chris, a design engineer and consultant. Chris is a registered professional engineer in California and Maryland and is a member of the Society of Automotive Engineers Committee, an organization involved in crash testing and investigations. He testified that he was familiar with the standards-making processes of professional societies and that he had experience in investigating crane, tractor, and automobile accidents.
 
 
 9
 The district court accepted Chris, over the objection of Harvester, as an expert in safety and mechanical engineering. In reviewing the evidence on Harvester's motion for judgment notwithstanding the verdict, however, the district court excluded Chris's testimony. The district court held that Chris was not qualified to express an opinion as to the design and safety standards of the TD7C because he "had never participated in any manner in approving, or even checking the design of a crawler tractor ...." Similarly, Harvester argues that Chris was not competent to testify because he lacked the necessary information and experience concerning the TD7C and because his inspection and tests concerning the tractor and materials to improve the tractor were inadequate. The court also held that Chris improperly testified as to the applicability of certain Occupational Safety and Health Administration (OSHA) standards because these standards apply only to employer-employee relationships.[2] Finally, the court held that Chris failed to demonstrate how the TD7C could have been changed to make it safer.
 
 
 10
 It is well established that an expert's qualifications depend upon his knowledge, skill, experience, training, or education, and the trial court is afforded the widest possible discretion in deciding whether a witness qualifies as an expert. Robert v. Conti Carriers & Terminals, 692 F.2d 22, 26 n. 8 (5th Cir.1982); Dunn v. Sears, Roebuck & Co., 639 F.2d 1171, 1174 (5th Cir.), modified on other grounds, 645 F.2d 511 (5th Cir.1981); Fed.R.Evid. 702. In exercising this broad discretion the district court did not err in accepting Chris as an expert but erroneously excluded Chris' testimony in rendering judgment notwithstanding the verdict, finding that Chris lacked experience concerning crawler tractors and had not checked or participated in approving the design of the TD7C. To the contrary, Chris had in fact inspected the design of the TD7C. He investigated the control arrangements of the Harvester tractor, examined a set of blueprints of the tractor, and viewed photographs showing the condition of the tractor at the time of the accident. Moreover, an expert is not required to have participated in approving the design of a product before he may testify concerning it. See Lenoir v. C.O. Porter Machinery Co., 672 F.2d 1240, 1244-45 (5th Cir.1982) (expert permitted to testify despite not having seen planer in operation).
 
 
 11
 We recently addressed this very issue in Grenada Steel Industries v. Alabama Oxygen Co., 695 F.2d 883, 889 (5th Cir.1983). There the defendants offered expert testimony that was primarily based upon post-fire photographs. The plaintiff argued that this testimony "was general, self-serving, and based on secondhand data and information, whereas [its] proof of the defective and unreasonably dangerous condition of the subject valve was firmly supported by firsthand observations, tests, and examinations...." We responded by stating:
 
 
 12
 These orotund arguments were addressed to the jury and that was the proper audience. It was for the jury to decide which of the experts was more credible, which used the more reliable data, and whose opinion--if any--the jury would accept. The jury might credit one or more of the expert opinions or it might reject them all.
 
 
 13
 Id. at 889. Once Chris was properly admitted as an expert, the jury was at liberty to accept or reject his testimony, and to judge his credibility. Id.; see also Dunn v. Sears, Roebuck & Co., 639 F.2d at 1174; Price v. Admiral Corp., 527 F.2d 412, 415 (5th Cir.1976). The court's findings and Harvester's arguments are, in fact, attacks on Chris' credibility and the weight to be given his testimony. This was the jury's province and the district court erred in holding otherwise.[3]
 
 
 14
 Assuming arguendo that Chris was not competent to express an expert opinion as to the safety of the TD7C, the district court still erred in disregarding that opinion in rendering judgment notwithstanding the verdict. In considering a motion for judgment notwithstanding the verdict (as opposed to a motion for a new trial), a district court may not exclude or disregard evidence admitted at trial on the basis that the admission was error. Sumitomo Bank of California v. Product Promotions, 717 F.2d 215, 218 (5th Cir.1983); see generally Childress, Standards of Review in Federal Civil Appeals: Fifth Circuit Illustration and Analysis, 29 Loyola L.Rev. 882, 917 (1983). The trial court must take the record as presented to the jury and cannot enter judgment on a record altered by the elimination of incompetent evidence. Sumitomo, 717 F.2d at 218; Midcontinent Broadcast Co. v. North Central Airlines, Inc., 471 F.2d 357, 358 (8th Cir.1973). Chris' testimony should have been considered by the district court in examining the sufficiency of the evidence.B.
 
 
 15
 There was substantial testimony concerning the applicability of certain standards of the Occupational Safety and Health Administration (OSHA) and American National Standards Institute (ANSI) to the TD7C.[4] The thrust of the standards is that the lower portion of the cab of a tractor used in logging operations should be completely enclosed with solid material, except at entrances, to prevent the operator from being injured from obstacles entering the cab. Harvester contends the standards should not have been admitted into evidence because they are inadmissible to prove negligence in products liability cases and are irrelevant to the TD7C.
 
 
 16
 In Melerine v. Avondale Shipyards, Inc., 659 F.2d 706, 710-12 (5th Cir.1981), we held that OSHA regulations provide evidence of the standard of care exacted of employers, and thus may only be used to establish negligence per se when the plaintiff is an employee of the defendant. We noted in dictum, however, that notwithstanding the absence of an employer-employee relationship, OSHA and ANSI standards could be offered as relevant evidence of a defendant's negligence as opposed to negligence per se. Id. at 713 n. 22. In Rabon v. Automatic Fasteners, Inc., 672 F.2d 1231, 1238 & n. 15 (5th Cir.1982), we reiterated that a violation of an OSHA regulation can be evidence of negligence or even, in appropriate circumstances, negligence per se, but in dictum questioned the relevancy of the OSHA regulations in that case because the proponent was not an employer. The question of relevancy, however, was not decided because the defendant did not object to the relevancy of the regulations at trial nor raise the issue on appeal. Id.
 
 
 17
 Harvester, relying upon Melerine and Rabon, argues that the OHSA regulations were inadmissible because Harvester was not Dixon's employer.[5] Although this position is not without some merit, we need not resolve that question today. Assuming the OSHA standards were erroneously admitted, the error was harmless because the OHSA standards were merely cumulative to the almost identical and properly admitted ANSI standards. The improper admission of evidence that is merely cumulative to properly admitted evidence is harmless error. Rabon, 672 F.2d at 1239; Coughlin v. Capitol Cement Co., 571 F.2d 290, 307 (5th Cir.1978). The admissibility of the ANSI standards, to the extent they are relevant, is clearly established in this circuit. See Alexander v. Conveyors & Dumpers, Inc., 731 F.2d 1221, 1229 (5th Cir.1984); Johnson v. William C. Ellis & Sons Iron Works, 604 F.2d 950, 957 (5th Cir.1979) modified 609 F.2d 820 (5th Cir.1980); Frazier v. Continental Oil Co., 568 F.2d 378, 382 (5th Cir.1978); Muncie Aviation Corp. v. Party Doll Fleet, 519 F.2d 1178, 1180 (5th Cir.1975).
 
 
 18
 Harvester concedes that consensus-opinion safety standards are generally admissible, but argues that these particular ANSI standards are irrelevant because they apply only to tractors designed for pulpwood logging and that the TD7C was not designed for pulpwood logging or engaged in such activity at the time of the accident. In support, Harvester brings to our attention the testimony of Elton Brown, an International Paper unit supervisor, who stated that the Pine Level Unit was not a logging station and that the TD7C was primarily used for fire suppression and control burning purposes. Harvester further notes the testimony of William Clark Jackson, a former chief engineer in Harvester's Product Integrity Area, who testified that the tractor was not equipped with a logging arch, indicating that it was not used in logging operations. On the other hand, Jackson admitted on cross-examination that Harvester had anticipated that the tractor would be used in logging operations. Ottis Davis, Dixon's co-employee, testified that the tractor was sometimes used for "skidding," a process that involved the movement of logs or pulpwood. There was also evidence that Harvester, in its sales brochure, offered a set of logging sweeps and a logging arch to be used in conjunction with a winch on the TD7C. The winch was designed to be used for "skidding" or hauling logs through the woods, an activity included in the ANSI standards. International Paper bought the particular tractor at issue with a rear screen, winch, logging sweeps and a logging cooling system, equipment which adapted the tractor for logging operations. Although the testimony was in dispute there was substantial evidence to indicate the relevancy of the ANSI standards to the TD7C tractor. The district court thus did not abuse its discretion in admitting the standards.[6]C.
 
 
 19
 Harvester asserts that the district court violated Rule 407 of the Federal Rules of Evidence by admitting an exhibit and testimony concerning the addition of screening and a metal plate to the tractor after Dixon was injured.[7] The policy behind Rule 407, of course, is to avoid discouraging defendants from making necessary repairs or changes to products or dangerous conditions. Mrs. Dixon argues that because the repairs were made by International Paper, a non-defendant, the evidence of the subsequent repairs would not contravene the policy behind Rule 407, and hence was admissible. Mrs. Dixon also contends that the evidence was admissible under the feasibility exception to Rule 407 and that Harvester failed to make a timely objection pursuant to Rule 103(a)(1), and thus review is limited to plain error.
 
 
 20
 In addressing these issues we begin by noting that Harvester made a motion-in-limine prior to trial to prohibit any reference to subsequent design changes in the TD7C or similar tractors on the grounds that such references are prohibited by Rule 407 and would unduly prejudice the jury. In addition, Harvester objected at the first two opportunities to testimony concerning subsequent remedial measures, specifically asserting that Rule 407 prohibited the evidence. In view of these objections, we find that the specific grounds for Harvester's subsequent objections were apparent from the context in which they were made. Fed.R.Evid. 103(a)(1).[8] Although Harvester preserved its objections for appellate review, we find no abuse of discretion in the district court's ruling.
 
 
 21
 In Grenada Steel, the plaintiff steel manufacturer brought suit against a manufacturer of oxygen tanks and the maker of valves that were attached to the tanks. The plaintiff contended that a defective valve caused a fire, which damaged one of its steel plants. The district court, applying Rule 407, excluded evidence that the defendant and a competitor manufactured a differently designed valve after the accident. The plaintiff argued on appeal that evidence of the competitor's alternatively designed valve was admissible because the policy behind Rule 407 would not be disserved. We recognized that "neither the text of Rule 407 nor the policy underlying it excludes evidence of subsequent repairs made by someone other than the defendant," but affirmed the district court's exclusion of the evidence under Rule 403 "because it lacked sufficient probative value and injected the dangers of confusion and misleading the jury." Id. at 889.
 
 
 22
 Here, International Paper repaired the TD7C tractor shortly after the accident by adding a metal plate and screening to give the tractor operator additional protection. Since these repairs were made by a non-defendant, Rule 407 does not bar the evidence. Grenada Steel, 695 F.2d at 889; Louisville & Nashville Ry Co. v. Williams, 370 F.2d 839, 843-44 (5th Cir.1966); accord Farner v. Paccar, Inc., 562 F.2d 518, 528 n. 20 (8th Cir.1977). As an alternative basis for our decision we hold that the feasibility exception to Rule 407 applies in this case. In Grenada Steel, we noted that the feasibility of alternative designs "may 'almost always' be in question in design defect cases," but we did not apply the feasibility exception because "the defendant clearly stated that feasibility was not controverted." 695 F.2d at 888-89. Here, unlike Grenada Steel, there was substantial testimony that the addition of protective structures to the TD7C, such as wire mesh or sheet metal, was not feasible because the operator's visibility would be impaired.[9] The evidence of alternatively designed tractors having additional protection thus was admissible to prove feasibility.
 
 
 23
 Any evidence not excluded by Rule 407, of course, must still be relevant and its probative value must, under Rule 403, outweigh any dangers associated with its admission. Anderson v. Malloy, 700 F.2d 1208, 1213 (8th Cir.1983); Grenada Steel, 695 F.2d at 888-89. Although the repairs in this case were made several years after the tractor was manufactured, the evidence was clearly relevant to demonstrate the feasibility of additional protective structures. The district court thus did not abuse its discretion in admitting it.
 
 
 24
 Harvester also complains that the district court erred in admitting testimony regarding photographs of certain tractors manufactured after 1972, the year in which the tractor at issue was made. Part of the contested evidence involved rubber-tired tractors illustrated in a buyers' guide published by Harvester in 1975. The admission of photographs of rubber-tired tractors through the testimony of Chris is also at issue. Harvester asserts that the illustrations and photographs violated Rule 407 and were unduly prejudicial and irrelevant because they depicted only logging equipment and not multi-purpose tractors such as the TD7C. Harvester specifically complains of the photographs and testimony concerning the Feller Buncher (a tractor manufactured by Harvester) because of the dissimilarities between it and the TD7C. Mrs. Dixon argues that the evidence concerning these tractors was properly admitted because it falls within the feasibility and impeachment exceptions to Rule 407 and because Harvester failed to specifically object to the evidence. We again hold that Harvester properly preserved its objections for appellate review but find the evidence admissible under the feasibility exception to Rule 407.
 
 
 25
 The relevancy of this evidence, however, presents a somewhat closer question. The Feller Buncher is a track-driven vehicle similar to the TD7C, with an operating speed of one and one-quarter miles an hour. Since the only apparent major difference from the TD7C is its hydraulic arm used for cutting trees, we cannot say the district court abused its discretion in admitting the photograph and evidence concerning the Feller Buncher. Rubber-tired tractors travel at top speeds of from fifteen to twenty miles an hour according to Jackson's testimony and are used in pulpwood logging operations. The TD7C had a top speed of four miles an hour and would operate at two miles an hour when plowing. It is at least arguable that operators of the much faster rubber-tired equipment need more protection than operators of track-driven equipment, and thus the relevancy of the rubber-tired tractors is called into question. Nonetheless, the district court has wide and flexible discretion concerning the admissibility of evidence, and considering that the TD7C and rubber-tired tractor are both used in woodlands operations, we hold that the district court did not abuse its discretion in this case. Because of our disposition of this issue, we decline to consider whether evidence of the subsequent designs was admissible under the impeachment exception to Rule 407.
 
 D.
 
 26
 As another ground of error, Harvester contends that the district court and plaintiff's counsel made highly inflammatory and prejudicial comments to the jury entitling it to a new trial. The first of these statements was made by the district judge who explained in the jury's presence that certain photographs he had excluded from evidence revealed "just a lot of blood--you know, blood gets people excited." In addition, prior to charging the jury, the district court stated:
 
 
 27
 Now, this accident arises and accrues as a result of an incident which happened in George County, Mississippi, on April 22, 1980, when Mr. Charlie Dixon was severely and painfully injured by a pine tree which was blown over by Hurricane Frederick at such an angle that it penetrated the front end of the crawler tractor that he was operating, and pinned him against the side, back and side of the cab of this tractor, resulting in a very severe and painful and permanent injury.
 
 
 28
 Mr. Dixon was not a well man; he was a very courageous fellow. He had an iron will and determination. He didn't want anybody to sympathize with him. He was just that type of man. (Emphasis in defendant's brief.)
 
 
 29
 In appraising the effect of these comments, we consider the record as a whole and not merely isolated remarks. Newman v. A.E. Staley Mfg. Co., 648 F.2d 330, 334-35 (5th Cir.1981); United States v. James, 528 F.2d 999, 1022 (5th Cir.), cert. denied sub nom., 429 U.S. 959, 97 S.Ct. 382, 50 L.Ed.2d 326 (1976). When a timely objection is made at trial, we must determine whether the remark impaired a substantial right of the objecting party, but when a trial judge's comments deny a party an opportunity for a fair and impartial trial, we will not deny review in the absence of objections because lawyers will often hesitate to challenge the propriety of a trial judge's comments for fear of antagonizing him and thereby prejudicing their clients' cases. Newman, 648 F.2d at 335; Miley v. Delta Marine Drilling Co., 473 F.2d 856, 857-58 (5th Cir.), cert. denied, 414 U.S. 871, 94 S.Ct. 93, 38 L.Ed.2d 89 (1973). When no objection is made at trial, however, appellate review is limited to plain error. Newman, 648 F.2d at 335; Morreale v. Downing, 630 F.2d 286, 290 (5th Cir.1980).
 
 
 30
 Since Harvester made no objection to any of the district court's comments, we consider only whether plain error was committed. In view of the substantial medical testimony explicitly describing Dixon's injury and the admission of photographs depicting his injuries, the district court's comment on the content of the excluded photographs merely informed the jury of what it was already aware of and thus was not plain error. We reach the same conclusion concerning the district court's preamble to charging the jury. The record clearly reflects, and indeed there is no dispute, that Dixon was painfully and severely injured; the district court's mere summation to that effect was not plain error. Finally, we have noted that while remarks by a district judge within the hearing of the jury are often necessary, a judge should be careful not to give the impression that he or she prefers one litigant or another. Newman, 648 F.2d at 334. Although the statement concerning Dixon's character could be interpreted as an expression of preference, we hold that, while certainly irrelevant, it is not plain error when viewed in the context of the record as a whole. Here the district court instructed the jury at great length that liability should not be imposed upon Harvester solely because an injury occurred. Further, the court warned the jury not to be moved by undue sympathy or prejudice, and to treat Harvester fairly as a person of equal standing and worth. The court also carefully instructed the jury that it was to draw no inference of favoritism from any comment the court may have made during trial. The court's charge as a whole reveals nothing to indicate that it preferred or favored a particular litigant.
 
 
 31
 Harvester also complains of the remarks of the plaintiff's counsel in closing argument when he referred to Harvester as "a million dollar corporation" and later requested the jury to "send a message out today when you return your verdict." To justify a reversal based on improper comments of counsel, the conduct must be such as to gravely impair the calm and dispassionate consideration of the case by the jury. Id.; Spach v. Monarch Insurance Co., 309 F.2d 949, 953 (5th Cir.1962). Since Harvester made a timely objection to the former statement we must consider whether a substantial right was impaired. The record reflects that the statement was made to indicate that Harvester had the capability to make the TD7C safer, not to illicit a punitive damage award which was not requested in this case. Furthermore, the district court, while not excluding the comment, explained to the jury that the case did not involve punitive damages. We hold that the remark impaired no substantial right of Harvester.
 
 
 32
 When the plaintiff's counsel requested the jury to "send a message" there was no objection from Harvester, therefore we consider only whether there was plain error. In view of the context in which the statement was made, and the court's lengthy instructions to the jury making clear that it was to decide the case based solely upon the evidence, we cannot say that plain error was committed. In summary, none of the comments made by the district court or plaintiff's counsel, individually or collectively, requires a new trial.
 
 E.
 
 33
 Finally, Harvester argues that two photographs depicting Dixon's injuries admitted by the district court were so highly prejudicial and inflammatory that it is entitled to a new trial on all issues.[10] The color photographs were taken for medical purposes by physicians at the George County Hospital. Mrs. Dixon offered the photographs to show that Dixon could not have stopped the crawler tractor after the accident, and to indicate the severity of his injuries. After an in camera inspection, the district court excluded the photographs it considered most prejudicial, but admitted the two at issue. These two revealed Dixon's abdominal area in its repaired condition. Although the photographs certainly were prejudicial, they also were relevant to demonstrate the nature of Dixon's injuries. We cannot say that the prejudice of the evidence substantially outweighed its probative value. Fed.R.Evid. 403. The district court did not abuse its sound discretion in admitting only these two photographs.
 
 IV.
 
 34
 In addition to the alleged evidentiary errors and prejudicial comments, Harvester contends that the district court should have granted its alternative motion for a new trial based upon insufficiency of the evidence. We disagree. The decision to grant or deny a motion for new trial generally is within the sound discretion of the trial court and will not be disturbed unless there is an abuse of that discretion or misapprehension of the law. Shows v. Jamison Bedding, Inc., 671 F.2d 927, 930 (5th Cir.1982); Evers v. Equifax, Inc., 650 F.2d 793, 796 (5th Cir.1981). This deferential standard of review applies especially in cases in which motions for new trials have been denied. Shows, 671 F.2d at 930; Evers, 650 F.2d at 796. On the record before us we hold for the reasons stated in Part V of this opinion that the evidence was sufficient to support the jury verdict and thus there was no abuse of discretion.
 
 V.
 
 35
 The primary issue in this appeal is whether the district court erred in granting judgment notwithstanding the verdict. In resolving this issue we begin by examining the evidence under strict liability theory. Since we must apply substantive state law in this diversity case, we look to the law of Mississippi for the appropriate standard of strict liability. Erie Railroad v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). Mississippi has adopted the American Law Institute's Restatement (Second) of Torts Sec. 402A as its standard of strict liability for products manufacturers. Grenada Steel Industries v. Alabama Oxygen Co., 695 F.2d 883, 885 (5th Cir.1983); Page v. Barko Hydraulics, 673 F.2d 134, 136 n. 1 (5th Cir.1982); State Stove Manufacturing Co. v. Hodges, 189 So.2d 113, 118 (Miss.1966), cert. denied sub nom. Yates v. Hodges, 386 U.S. 912, 87 S.Ct. 860, 17 L.Ed.2d 784 (1967). The plaintiff must establish "that the product when sold was in a defective condition, unreasonably dangerous to the user or the consumer; the product must reach the user or consumer without substantial change in the condition existing at the time of sale; and the defective condition must be a substantial element in the cause of the injury." Fairley v. American Hoist & Derrick Co., 640 F.2d 679, 681 (5th Cir.1981).
 
 
 36
 With these requirements in mind, we now examine the evidence to determine whether the jury reasonably could have found Harvester strictly liable. In reviewing the sufficiency of the evidence we consider all of the evidence in the light, and with all reasonable inferences, most favorable to Mrs. Dixon. Boeing Co. v. Shipman, 411 F.2d 365, 374 (5th Cir.1969). If there is substantial evidence of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment could reach different conclusions, the motion should be denied. Id. At trial, the deposition of Dixon was entered into evidence in which he testified that he never expected that an object would enter through or penetrate the bottom of the tractor cab. He also testified that he had plowed firelanes with completely enclosed equipment (with plexiglass and metal screening) and had pulled wood with such equipment. Ottis Davis, a co-employee who had operated the TD7C and other tractors since 1960, testified that if the lower portion of the tractor had been enclosed with metal, the chances of injury would have been reduced, and that International Paper had in fact placed screening and a solid metal plate in the area where the tree had entered the tractor to prevent similar accidents in the future. Steven Chris, the plaintiff's expert, testified that the intrusion of small trees into tractor cabs was a problem known to manufacturers and efforts had been made to correct the problem. He stated that materials such as tempered glass and wire mesh were available at the time of manufacture that would have prevented the accident. He also testified that the TD7C was unsafe and did not comply with the applicable safety standards at the time of manufacture.[11]
 
 
 37
 ANSI standards were admitted into evidence through the deposition of Kenneth Rolston, president of the American Pulpwood Association. The standards required solid metal protection at the bottom of tractors to be used in logging operations. Jackson testified that Harvester was involved in the formulation of ANSI standards and was probably aware of them and had access to them in 1972, the year the tractor was manufactured. He also stated that Harvester marketed the TD7C for woodlands operations and that fire-lane plowing was common in such operations. Ottis Davis testified that the tractor had a winch which was used in woodlands operations including "skidding," an activity expressly included in the ANSI standards.
 
 
 38
 Although the evidence was in sharp dispute and there was a substantial amount, perhaps even a greater amount, of evidence indicating the TD7C was not defective, we cannot say that fair and impartial minds could not have reached a different conclusion on this record. Contrary to the district court's conclusion, there was substantial evidence to support the jury's verdict that the tractor was defective.[12] Since there was substantial evidence to support the jury's finding of liability under strict liability theory, we need not consider whether the TD7C was negligently designed since our remand is solely limited to damages.
 
 VI.
 A.
 
 39
 The final contested issues concern the jury's assessment of damages. Harvester contends that the district court's charge to the jury concerning damages was confusing and misleading and permitted the jury to pyramid damages since the phrase "pain and suffering" was included twice in the instructions. Harvester also argues that damages should have been limited to those incurred between the dates of the accident and Dixon's death instead of for "permanent injury and disability" as the district court instructed. Finally, Harvester asserts that the jury should not have been allowed to award Mrs. Dixon damages for loss of certain elements of consortium such as love, affection, companionship, and physical assistance, because there was no proof to support those claims.
 
 
 40
 In reviewing the jury instructions, we consider the charge as a whole and determine not whether the jury charge was faultless in every particular but whether the jury was misled in any way and whether it had an understanding of the issues and its duty to determine those issues. Robert, 692 F.2d at 24; Smith v. Borg-Warner Corp., 626 F.2d 384, 386 (5th Cir.1980); Coughlin v. Capitol Cement Co., 571 F.2d 290, 300 (5th Cir.1978). To begin, it was clear that Dixon suffered a permanent injury and that he died of an unrelated disease. The district court expressly instructed the jury that it could not award damages for Dixon's premature death. The jury therefore was not misled into believing that it could award damages after Dixon's death. Also, we are unable to understand how the inclusion of the phrase "pain and suffering" at two separate points in the jury instructions could have led the jury to believe that they should double their award of damages for Dixon's pain and suffering. Finally, there was sufficient evidence of interference with the husband-wife relationship from which the jury could reasonably infer that Mrs. Dixon suffered damages for loss of each element of consortium. Mrs. Dixon specifically testified that she and Dixon were unable to engage in normal sexual relations after the accident and that his injuries required her constant attention. This testimony along with the substantial medical testimony indicating the severity of the injury was sufficient to support the consortium instruction. In sum, while perhaps not flawlessly drafted, the jury instructions accurately stated the applicable law and were supported by the evidence adduced at trial.
 
 B.
 
 41
 Harvester finally contests the assessment of damages by the jury, asserting that it so excessive as to evidence bias, prejudice, corruption and sympathy. The amount of the verdict was $2,821,871.64 for Dixon's personal injuries and damages resulting to Mrs. Dixon. The evidence at trial clearly indicates the seriousness of Dixon's injuries which the district court described: "Decedent lost both testicles, complete avulsion of his femoral artery and vein, avulsion of the majority of the skin on his penis, severing of his femoral nerve, tearing away of entire skin on his abdomen from his groin to his navel, extensive pain and suffering while pinned up against the tractor immediately following the accident, extensive pain and suffering following surgery, arterial replacement and grafting of skin." Dr. Thomas Shaw, the physician who first treated Dixon stated that Dixon was "critical and seriously ill, tending upon irreversibly ill." Dr. Dewey Lane, a surgeon who operated on Dixon, testified by deposition that it was "one of the worst injuries of this nature that [he had ever] encountered." Other physicians also described Dixon's injuries and the adverse psychological effects that resulted from the series of operations performed on him, some of which were required because of complications resulting from previous treatments. The record is replete with evidence too extensive to detail here of the pain and suffering Dixon endured and the damages resulting to Mrs. Dixon. Medical expenses were stipulated in the amount of $21,871.64 and Dixon's lost wages totalled $7,768.00. His earning capacity, however, was not permanently impaired. When Dixon returned to work on January 2, 1981, less than nine months after the accident, he received the same salary that he earned prior to the accident and had received a raise prior to leaving work because of his cancer condition.
 
 
 42
 Although each case must be decided on its own facts, awards affirmed by the Mississippi Supreme Court for similar injuries are instructive in this diversity case. Furthermore, prior awards may be of some aid when the present award is shown to be greatly disproportionate to past awards for similar injuries. Haley v. Pan American World Airways, 746 F.2d 311 at 318 (5th Cir.1984). Accordingly, our attention has been directed to the two Mississippi decisions conceded by Mrs. Dixon to be most similar to this case. In Jesco, Inc. v. Shannon, 451 So.2d 694 (Miss.1984), and Stubblefield v. Jesco, Inc., 458 So.2d 699 (Miss.1984), the Mississippi Supreme Court affirmed damage awards of $1,024,268 and $1,200,000 respectively to plaintiffs who suffered personal injuries in a common grain mill explosion. The plaintiff in Shannon suffered first, second, and third degree burns over thirty-eight percent of his body, which resulted in a twenty percent general disability. The plaintiff incurred medical expenses of over $23,000, and the plaintiff's expert testified that the plaintiff lost wages of over $40,000 prior to trial and would lose future earnings of over $214,000 when discounted to net present value. 451 So.2d at 698-99.
 
 
 43
 The plaintiff in Stubblefield suffered burns on sixty percent of his body, including his face, neck, arms, chest, back and legs. His treating physician testified that the plaintiff had a total permanent disability of seventy-five percent and was the most severely injured patient he had ever seen live. Because of the nature of the plaintiff's injuries, he was required to undergo painful baths to remove damaged skin, baths so excruciating they caused him to lose consciousness. The plaintiff lost almost all of his sweat glands and suffered severe deformities of the skin and neck as a result of the accident. He was hospitalized for 300 days and incurred medical bills of over $126,000 prior to trial. His treating physician testified that there was a strong possibility the plaintiff would require future hospitalization. 458 So.2d at 702-03.
 
 
 44
 Unlike Dixon, the working abilities and earning capacities of the plaintiffs in Shannon and Stubblefield were substantially impaired, and unlike Dixon, their suffering and disabilities did not cease with an untimely and unrelated death, but rather their suffering and loss of income was projected for the remainder of their natural lives. Yet the respective awards for these plaintiffs was less than half of that awarded Dixon.
 
 
 45
 As we have noted, Mrs. Dixon was awarded over $2.8 million by the jury. It is clear that the overwhelming portion of the award related to Dixon's pain and suffering. There can be absolutely no question that Dixon's suffering was initially as intense as the human body and mind can bear. Although the pain and suffering continued for several months, within nine months of the accident Dixon was mentally and physically able to return to his former job with no impairment of earning capacity. It is true that he continued to suffer mental pain and anguish because, as he is reported to have said, he was only "half a man." A serious consideration in our review of the verdict, however, is that Dixon's mental suffering lasted for a period of only two and one-half years because of his death that was wholly unrelated to the accident. We are consequently persuaded that the jury verdict was an excessive award for Dixon's pain and suffering and for Mrs. Dixon's loss of consortium.
 
 
 46
 We do not reverse a jury verdict for excessiveness except on the strongest of showings, but when a jury's award exceeds the bounds of reasonable recovery, we must suggest a remittitur ourselves or direct the district court to do so. Caldarera v. Eastern Airlines, Inc., 705 F.2d 778, 784 (5th Cir.1983); Howell v. Marmpegaso Compania Naviera, 536 F.2d 1032, 1034-35 (5th Cir.1976). Our power to grant a remittitur is the same as the district court's. We determine the size of the remittitur in accordance with this circuit's "maximum recovery rule" by reducing the verdict to the maximum amount the jury could properly have awarded. Caldarera, 705 F.2d at 784; Carlton v. H.C. Price Co., 640 F.2d 573, 582 n. 14 (5th Cir.1981); Stapleton v. Kawasaki Heavy Industries, Ltd., 608 F.2d 571, 574 n. 7 (5th Cir.1979), modified on other grounds, 612 F.2d 905 (5th Cir.1980). Our reassessment of damages cannot be supported entirely by rational analysis, but is inherently subjective, involving experience and emotions as well as calculation. Caldarera, 705 F.2d at 784.
 
 
 47
 After carefully reviewing the record, we believe that $500,000 for Dixon's pain and suffering would be reasonable. We believe that $75,000 would reasonably compensate Mrs. Dixon for her loss of consortium prior to her husband's death. We must be careful, however, not simply to substitute our view of a reasonable amount for the verdict of a jury. Gorsalitz v. Olin Mathieson Chemical Corp., 429 F.2d 1033, 1047 (5th Cir.1970), cert. denied, 407 U.S. 921, 92 S.Ct. 2463, 32 L.Ed.2d 807 (1972). We therefore add fifty percent to these amounts to arrive at a figure that appears to us to be the maximum a jury could award for these elements of damage. See Caldarera, 705 F.2d at 785. We add to this amount $21,871.64 for medical expenses incurred by Dixon, and $7,768.00 representing lost wages, for a total award of $892,139.64. Should Mrs. Dixon refuse to accept the reduction of the award, she will be entitled to a new trial on damages alone. Higgins v. Smith International, Inc., 716 F.2d 278, 281 (5th Cir.1983); Keyes v. Lauga, 635 F.2d 330, 336 (5th Cir.1981).
 
 
 48
 In our remittitur, we have been guided by awards affirmed by the Mississippi Supreme Court and in particular the two cases that appear to be most relevant to this case. In Shannon and Stubblefield the plaintiffs suffered permanent disabilities of twenty percent and seventy-five percent respectively. The plaintiff in Stubblefield apparently experienced pain as serious and excruciating as, and perhaps for a longer period of time than Dixon. Moreover, the plaintiffs in Stubblefield and Shannon recovered for future pain and suffering, future medical expenses and loss of future earnings. None of these damages was available to Mrs. Dixon because of Dixon's untimely death. In view of the important distinctions between the instant case and these Mississippi cases, which Mrs. Dixon concedes represent the highest personal injury verdicts in Mississippi history, we are convinced that any addition to our award would be excessive judged by the standards of the Mississippi Supreme Court.
 
 VII.
 
 49
 In conclusion, we hold that the district court erred in rendering judgment notwithstanding the verdict. We therefore direct the district court to reinstate the jury verdict, but, because the jury's assessment of damages is excessive, we offer the plaintiff a remittitur of $892,139.64 or a new trial on damages alone. We further hold that International Paper is entitled to reimbursement of $43,916.79 from the damage award, representing the amount it paid to Dixon as workmen's compensation benefits. This case is
 
 
 50
 AFFIRMED IN PART, REVERSED IN PART AND REMANDED.
 
 
 
 [1]
 Tractor & Equipment Company of Mobile, Alabama, the retailer of the tractor at issue, was also named as a defendant, but a directed verdict was granted in its favor. Mrs. Dixon does not contest the propriety of the directed verdict in this appeal
 
 
 [2]
 The district court specifically held that Chris' testimony concerning OSHA design and safety standards violated this court's decision in Melerine v. Avondale Shipyards, Inc., 659 F.2d 706 (5th Cir.1981). We address this ruling in section III B
 
 
 [3]
 The competency of Chris to render an expert opinion as to the safety of the TD7C is adequately supported in the record. Harvester therefore is not entitled to a new trial because of the admission of Chris' testimony
 
 
 [4]
 The standards at issue were embodied in ANSI Standard 03-1-1971, and later incorporated into OSHA regulations codified at 29 C.F.R. Sec. 1910.266. The OSHA standard, entitled Pulpwood Logging, introduced by Mrs. Dixon provides in relevant part:
 (a) Application--(1) General. This section applies to pulpwood logging operations including but not limited to the operations of felling, limbing, marking, bucking, loading, skidding, prehauling and other operations associated with the preparation and movement of pulpwood timber from the stump to the point of delivery. The provisions of the section do not apply to logging operations relating to saw logs, veneer bolts, poles, piling and other forest products.
 ....
 (d) Equipment protective devices--stationary and mobile equipment--(iv) The lower portion of cab shall be completely enclosed with solid material, except at entrances, to prevent the operator from being injured from obstacles entering the cab.
 ANSI standard 03.1-1971 introduced by Mrs. Dixon provides in relevant part:
 
 
 [1]
 1 Scope. This standard establishes safety practices for pulpwood logging operations to include but not to be limited to the operations of felling, limbing, marking, bucking, loading, skidding, prehauling and other operations associated with the preparation and movement of pulpwood timber from the stump to the point of delivery
 ....
 
 
 [3]
 2.4 The lower portion of the cab shall be completely enclosed with solid material, except at entrances, to prevent the operator from being injured from obstacles entering the cab
 
 
 [5]
 Harvester also relies upon Lenoir v. C.O. Porter Machinery Co., 672 F.2d 1240 (5th Cir.1982), a Mississippi diversity action in which the defendant manufacturer introduced a citation issued by OHSA to the plaintiff's employer to show that its product was safe. The Lenoir panel held the document inadmissible, but found the error harmless because of the document's slight probative value. Although Harvester urges us to read Lenoir as holding that OSHA regulations are inadmissible to prove negligence in civil actions, we are not persuaded to adopt that view
 First, although the Lenoir panel did not note the distinction, the citation issued in that case was not a regulation but was the opinion of an investigator who made a plant-wide inspection of the plaintiff's workplace. Thus, the citation did not carry with it the indicia of reliability that is inherent in government-adopted safety standards which are usually formulated after public notice and extensive fact-finding processes. More important, the Lenoir panel relied upon Otto v. Specialities, Inc., 386 F.Supp. 1240, 1245 (N.D.Miss.1974), in which the court refused to admit OHSA standards as either conclusive proof or evidence of negligence, because "the Supreme Court of Mississippi would be persuaded ... to refuse to permit the utilization of OSHA safety standards ...." The district court's reliance upon state law, however, was misplaced because federal law governs the admissibility of evidence in diversity cases. Rabon, 632 F.2d at 1238 n. 14; Southern Pacific Transportation Co. v. Smith Material Corp., 616 F.2d 111, 115 (5th Cir.1980); Johnson v. William C. Ellis & Sons Iron Works, 604 F.2d 950, 957 (5th Cir.1979). Additionally, the Lenoir panel did not consider our previous decisions in Melerine and Rabon in which we suggested that OSHA regulations may be admissible to prove negligence in appropriate cases. For these reasons, we do not read Lenoir as a bar to the admissibility of OSHA regulations in products liability cases.
 
 
 [6]
 Harvester also argues that the admission of the OSHA and ANSI standards was highly prejudicial and confused and misled the jury. In addressing this issue we simply reiterate that the ANSI standards were properly admitted and the OSHA standards, being essentially the same, were at best cumulative of that properly admitted. Furthermore, Harvester itself introduced into evidence the 1978 edition of the ANSI standards and OSHA regulations codified at 29 U.S.C. Sec. 654. The ANSI standards were introduced to show that logging tractors were no longer required to have protection at the bottoms of the cabs. The OSHA regulations were introduced to show that solid metal or screening was not required across the fronts of tractors designed for site clearing and that fire lane plowing was considered a part of site clearing. Although we certainly do not hold that Harvester waived its right to contest the OSHA and ANSI standards, by introducing these standards Harvester presented evidence of the same sort, except in its favor, to the jury
 
 
 [7]
 Fed.R.Evid. 407 provides:
 Subsequent Remedial Measures
 When, after an event, measures are taken which, if taken previously, would have made the event less likely to occur, evidence of the subsequent measures is not admissible to prove negligence or culpable conduct in connection with the event. This rule does not require the exclusion of evidence of subsequent measures when offered for another purpose, such as proving ownership, control, or feasibility of precautionary measures, if controverted, or impeachment.
 
 
 [8]
 In Collins v. Wayne Corp., 621 F.2d 777, 784 (5th Cir.1980), we held that a motion in limine alone will not suffice as a proper objection to matters subsequently raised at trial. Our decision today is not inconsistent with Collins. We hold only that Harvester's motion in limine coupled with two specific objections at trial made the district court aware of its position and thus satisfied Rule 103(a)(1)
 
 
 [9]
 Jackson, Joseph T. Croom, an International Paper woodlands manager, and Ross Sherman, a district forester with the Mississippi Forestry Commission, all testified for the defendants that the addition of screening or sheet metal in the front of the TD7C would impair the operator's visibility
 
 
 [10]
 Harvester also complains of the admission of photographs illustrating the TD7C shortly after the accident. Although the photographs revealed blood stains inside the tractor cab, they were not unduly prejudicial or inflammatory. The district court clearly did not abuse its discretion in admitting those photographs
 
 
 [11]
 In addition, Chris testified that the control system on the TD7C was defective, asserting that it lacked an emergency shut-off on the righthand side of the tractor so that it could be shut off from either side of the operator
 
 
 [12]
 The district court also erred in concluding that the addition of brush guards to the tractor by International Paper shielded Harvester from liability. The alteration of the TD7C by International Paper was not the type of substantial change that insulates a manufacturer from strict liability. There is no evidence in the record that the brush guards added by International Paper contributed to the accident. In fact, Jackson, testifying on Harvester's behalf, stated that the brush guards provided the most extensive protection he had ever seen