Barbara HERRINGTON and Robby Herrington, Individually and as Next Friends for Jeanna Herrington, a Minor, Plaintiffs-Appellants,

v.

Durrell HILLER, M.D., et al., Defendants.

Texarkana Memorial Hospital, Inc., d/b/a Wadley Regional Medical Center, Defendant-Appellee.

No. 88-2777.

United States Court of Appeals, Fifth Circuit.

Sept. 19, 1989.

Tom Needham, Ford, Needham & Johnson, Dallas, Tex., for plaintiffs-appellants.

Victor Hlavinka, Atchley, Russell, Waldrop & Hlavinka, Texarkana, Tex., for Wadley Hosp.

Before KING, HIGGINBOTHAM, and SMITH, Circuit Judges.

JERRY E. SMITH, Circuit Judge:

We consider here the appeal of Barbara and Robby Herrington, who, individually and on behalf of their daughter Jeanna, brought suit against the hospital where Jeanna was born, alleging that the hospital's failure to provide twenty-four-hour anesthesia services proximately caused Jeanna's injuries. The jury found for defendant; the Herringtons appeal, charging error on three grounds: (1) the court erred in refusing to allow plaintiffs to introduce either direct or rebuttal evidence of the hospital's subsequent decision to provide twenty-four-hour anesthesia services; (2) the court erred in permitting the hospital to present a surprise expert witness; and (3) the court erred in permitting the defense to inquire into religious affiliations when the inquiry was forbidden by the court's order *in limine*. Though we find this an atypical and a close case, we conclude that the Herringtons' first charge of error has merit. Accordingly, we vacate the judgment and remand for a new trial.

## I. *The Event.*

■ The facts are simple and, with the exception of the chronology of events, undisputed. On July 8, 1985, at approximately 3:00 a.m., Barbara Herrington went to the Wadley Regional Medical Center ("Wadley Center" or "the Center") in Texarkana, Texas, to give birth. While in labor, she suffered a catastrophic rupture of her uterus. The attending physician, Dr. Durell Hiller,[1] determined that a cesarean section was needed immediately. No anesthesia provider was present at the hospital, and one was called from home. Delivery of the child was accomplished within minutes of the nurse-anesthetist's arrival. However, because of lack of oxygen and consequent brain damage caused by the delay, Jeanna Herrington was born severely crippled and retarded.[2]

## II. *Remedial Evidence.*

### A. *The Proffer and the Ruling.*

The Herringtons argued that the hospital's failure to provide twenty-four-hour anesthesia services was below the accepted standard of care for such a facility.[3] In order to prove the negligent character of the hospital's policy, the Herringtons tried to introduce evidence concerning the efforts of those staff anesthesiologists who were in favor of twenty-four-hour services to persuade the Center to adopt such a practice, and concerning the Center's eventual implementation of such services. This evidence, however, could not be admitted without some cost to the proceedings: The evidence strongly indicates that the reason that the hospital did not provide twenty-four-hour services was its refusal to allow Certified Registered Nurse Anesthetists ("CRNA's") to place epidural catheters in

---

1. Dr. Hiller originally was a defendant in this action but settled with plaintiffs for $600,000. The district court approved the settlement, apportioning $375,000 to the parents and placing $225,000 in trust for the child. The settlement was pursuant to a "Mary Carter" agreement, whereby the amount owed by Dr. Hiller would be reduced by some proportion of any recovery from the Wadley Center.

2. The record reflects uncontroverted evidence that the grave danger to the fetus in uterine ruptures is not the rupture itself, but the separation of the oxygen-supplying placenta. See testimony of Dr. Michael Holland. That Jeanna Herrington was born alive indicates that the placenta did not separate until some minutes before the cesarean section. Thus, the Herringtons' allegation that an earlier cesarean section

might have prevented Jeanna's condition has some merit. Therefore, we cannot reject the Herringtons' claims concerning standard of care to the effect that any error committed by the district court would have been harmless because that standard of care was not, and could not have been, the proximate cause of Jeanna's condition.

3. As plaintiffs observe, Wadley Center is a 448-bed facility, making it among the largest in Texas. The Center services approximately 400,-000 people who live within 60–mile radius. It has the only obstetrical unit available within that radius. The obstetrical unit comprises seven labor rooms and three surgical delivery rooms and handles high-risk pregnancies, delivering over 2,000 children a year—an average of five per day.

preparation for administering anesthesia.[4] Prior to July 1985, anesthesia and Intensive Care, Inc. ("AIC"), the third-party provider of anesthesia services, had proposed providing twenty-four-hour services, but only on the condition that the hospital would permit CRNA's to place catheters. Any challenge to the hospital's standard of care thus led ineluctably to the issue involving AIC and the CRNA's.

The Herringtons' proffered evidence included the following:

1. Dr. James Burnett,[5] board certified anesthesiologist and member of the medical staff at Wadley Center, testified that his opinion, prior to the institution of twenty-four-hour anesthesia services in September 1987, was that these services would result in a great improvement in care, were of major importance to the obstetrical population at Wadley Center, and would reduce potential liability.

2. A letter from Dr. Burnett to Dr. Roysten Brown, president of Wadley Center at the time, stated the opinions described above. The letter was signed by eight other obstetricians at Wadley Center.

3. Attached to the letter was a proposed "protocol" for anesthesia services at Wadley Center. The protocol provided that a CRNA would be on call twenty-four hours a day, that four named CRNA's were to be granted epidural anesthesia privileges, and that placement of an epidural catheter would occur only at the request of, and with the supervision of, an obstetrician.

4. Dr. Burnett's further testimony concerned the reason why around-the-clock services had not been provided: Wadley Center's policy had been not to allow the CRNA's to place epidural catheters. For that reason, AIC had refused to provide around-the-clock services.[6]

5. Though Wadley Center could have provided around-the-clock services to supplement the group's services, it chose not to do so.

6. Dr. Hiller, the Herringtons' obstetrician, testified (also out of the presence of the jury) that he had supported the twenty-four-hour protocol for the same reasons as Dr. Burnett and that the improvement in service in 1985 would have been the same as it was in 1987 when the protocol eventually was instituted.

7. Dr. Brown, an anesthesiologist, testified out of the jury's presence that he was aware of the opinion held by Burnett and other doctors but disagreed with them on the CRNA issue.

The record indicates that the district court considered the evidence concerning the protocol and CRNA's to be tangential to the standard-of-care issue and hence, pursuant to Fed.R.Evid. 403,[7] excluded all evidence of remedial measures taken after July 8, 1985. The court specifically declined to base its ruling upon Fed.R.Evid. 407[8] on the basis of precedent holding that

---

**4.** As explained by Dr. Roysten Brown, epidural catheters are used to administer anesthetics to a particular region of the body. At Wadley Center in 1985, CRNA's were not permitted to place epidural catheters and therefore do regional anesthetics but were permitted to put the patient completely under anesthesia with a general anesthetic; indeed, a CRNA, Ray Pitre, gave Mrs. Herrington her general anesthetic when Jeanna was born.

**5.** Dr. Burnett testified at trial, but only outside the presence of the jury. The same was generally true for the Herringtons' offers of proof through other witnesses, as well.

**6.** Defendant's brief, in its own description of the excluded evidence, notes that "AIC had used the enticement of making its employed CRNAs available for 24–hour 'on-premises' coverage in obstetrics as a 'bargaining-chip' in hopes of eliciting [the] Board of Directors' approval of a protocol that would allow CRNAs to administer epidural anesthesia."

**7.** Fed.R.Evid. 403 provides,

Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

**8.** Fed.R.Evid. 407 provides,

When, after an event, measures are taken which, if taken previously, would have made

changes made by a third-party—in this case, AIC—do not come under that rule.[9] In explaining its application of rule 403, the court stated,

> While the evidence might have some small relevance, some small amount [of] probative value on the issue of the alleged negligence of the defendant in failing to adhere to the proper standard of care, the Court is of the opinion that it would tend to confuse the jury by diverting its attention from the standard of care at the time of the operation performed in this case, and for that reason it should be excluded.

### B. *Standard of review.*

■ We review a district court's evidentiary rulings only for abuse of discretion. See *McGonigal v. Gearhart Inds., Inc.*, 851 F.2d 774, 777 (5th Cir.1988). In cases involving rule 403 in particular, we have cautioned that because these rulings are "often inextricably bound with the facts of a particular case [, they] will not be disturbed absent a showing of clear abuse." *Shipp v. General Motors Corp.*, 750 F.2d 418, 427 (5th Cir.1985). However, we have also cautioned district courts against overuse of rule 403 as an exclusionary device: "Because rule 403 permits the exclusion of probative evidence it is an extraordinary remedy that must be used sparingly." *Dartez v. Fibreboard Corp.*, 765 F.2d 456, 461 (5th Cir.1985) (citing *United States v. Thevis*, 665 F.2d 616, 633 (5th Cir.), cert. denied, 459 U.S. 825, 103 S.Ct. 57, 74 L.Ed.2d 61 (1982)).

### C. *Weighing the Relevance and Dangers of the Remedial Evidence.*

■ The Center contends that for two reasons, no abuse of discretion occurred here: First, the Center maintains that the evidence, pertaining as it did to the dispute concerning the CRNA's and epidural catheters, was extraneous to the standard-of-care issue and involved a legitimate and sincere difference of opinion concerning the medical wisdom of the Center's policy. Second, the Center asserts that the probative value of the Herringtons' remedial evidence should be discounted because those changes did not occur until almost two years after Jeanna's birth.

We do not find either argument persuasive. Primarily, we do not share the district court's implicit conclusion that the dispute regarding CRNA's was "extraneous" to the central issues in the case and thus of little probative value. The records and the briefs make pellucid the connection between the CRNA dispute and the standard of care which the Medical Center provided: The CRNA dispute was the only barrier to the institution of twenty-four-hour anesthesia services—services that the Herringtons validly argue might have prevented the brain damage to their daughter.[10] In its brief, the Center identifies the CRNA dispute as the central reason why such services were not provided. It explains that on-premises, twenty-four-hour coverage indeed was feasible in 1985 and that, although the cost was high and personnel somewhat scarce, neither was a prohibitive factor. The hospital's policy being determinative of the standard of care provided, the reasonableness of that standard of care logically stands or falls with the reasonableness of the policy. Hence, by the Center's own admission, the issue that was considered to be "extraneous" is, in reality, vital to the resolution of the Herringtons' claims.

Our examination of the record also reveals no reason to suspect that the proffered evidence would have unduly distracted and confused the jury: The jury could

---

the event less likely to occur, evidence of subsequent measures is not admissible to prove negligence or culpable conduct in connection with the event. This rule does not require the exclusion of evidence of subsequent measures when offered for another purpose, such as proving ownership, control, or feasibility of precautionary measures, if controverted, or impeachment.

**9.** See, e.g., *Koonce v. Quaker Safety Prods. & Mfg. Co.*, 798 F.2d 700, 719 (5th Cir.1986); *Dixon v. International Harvester Co.*, 754 F.2d 573, 583 (5th Cir.1985).

**10.** See supra note 3.

have based a defense verdict entirely upon its conclusion that the policy behind the standard of care was a reasonable one and thus, so was the standard of care; in essence that is the Center's argument here. So, too, could it have based a plaintiff's verdict upon a contrary finding. Nor was the testimony unduly confusing: Through Dr. Brown's testimony, the jury already was familiar with CRNA's and the fact that they were not allowed to place epidural catheters in 1985. Drs. Brown and Burnett could have served ably as expert witnesses on either side of the CRNA dispute. In testimony outside the jury's presence, both gave cogent explanations of their respective positions in that dispute.

Further, we cannot accept the Center's argument that its CRNA policy could not be a source of liability since it was founded upon "sound medical judgment." We are aware of no "medical policy rule" akin to the business judgment rule. Medical policies, like the policies instituted by other professionals who hold themselves out as having a high level of skill, must be subject to reasoned assessment by courts and juries.

Here, the jury did not have before it the remaining pieces of the puzzle which it needed to make reasoned comparison of the Center's standard of care with that provided by other hospitals; the jury had heard that other hospitals did provide twenty-four-hour anesthesia services and that cost and availability of personnel were not factors preventing the implementation of such services. In addition, Dr. Brown, in testimony before the jury, denied that the CRNA dispute was the "real reason" why twenty-four-hour coverage was not available. At the very least, then, the proffered evidence should have been admitted to explain the Center's role in determining the level of services provided and to rebut Dr. Brown's testimony.

The record further reveals a dispute over whether the Center's CRNA policy was grounded solely in differences over the medical-technical skills of the CRNA's. Dr. Burnett's proffered testimony indicates that he perceived the dispute to be "political" in nature—testimony that again would have rebutted Dr. Brown's claim that it was medically sound practice that epidural catheters be placed only by doctors.

Finally, we do not agree with the Center that the fact of the two-year interim between Jeanna Herrington's birth and the implementation of twenty-four-hour, in-house services at Wadley Center significantly reduced the probative value of the proffered evidence. First, much of the evidence concerns the efforts of the obstetrics-gynecology staff, *prior* to the date of implementation (September 1987), to change the hospital's policy. Second, Dr. Hiller testified that in his opinion, the improvement provided by the implementation of twenty-four-hour services in 1987 was as great as it would have been in 1985. Third, according to Dr. Brown, Wadley Center's anesthesia staff committee had considered the issue of twenty-four-hour, in-house coverage "many times" prior to 1985. Fourth, the Center does not offer any reasons why, from a medical perspective, the standard of care provided in 1987 might be expected to have improved significantly since 1985; in other words, the Center cannot point to a technical barrier to twenty-four-hour coverage that existed in 1985 but not in 1987. See *Dixon*, 754 F.2d at 584 (though defendant made repairs several years after manufacture, evidence was relevant to show feasibility of additional protection).[11]

### III. *Conclusion.*

In sum, we do not find that the proffered testimony would have had an "undue tendency to suggest decision on an improper

---

**11.** In the district court, the defendant made no objection to the court's observation that the evidence of remedial measures is not excludable under rule 407 if the measures are undertaken by a third party. Of course, defendant may have perceived no reason to object, as the court excluded the evidence under rule 403. On appeal, the defendant has not contended, and has not briefed the assertion, that rule 407 authorizes exclusion of third-party changes. As the district court noted, the authorities are adverse to defendants in this regard. See, e.g., *Dixon*, 754 F.2d at 583 (citing, e.g., *Grenada Steel Indus. v. Alabama Oxygen Co.*, 695 F.2d 883, 889 (5th Cir.1983), and *Louisville & Nashville Ry. v. Williams*, 370 F.2d 839, 843–44 (5th Cir.1966)).

basis." Fed.R.Evid. 403 advisory committee note. The strong causal connection between the CRNA policy and the level of services provided also eliminates the danger of confusion and distraction. The jury therefore should have had before it the evidence revealing the hospital's reasons for providing a standard of care which the Herringtons alleged to be deficient.[12] Accordingly, we VACATE the judgment and REMAND for a new trial.

---

**12.** As we vacate and remand on this issue, we do not address the Herringtons' two additional points of error concerning an alleged surprise expert witness and inquiries into religious affiliation.