226 N.J. Super. 572 (1988)
545 A.2d 213
WILLIAM B. MILLISON, AND MARIE MILLISON, HIS WIFE; VERNON G. KRONMAIER AND DOROTHY KRONMAIER, HIS WIFE; SUSAN SCHWEBEL, INDIVIDUALLY AND AS EXECUTRIX OF THE ESTATE OF HAROLD SCHWEBEL; CLARENCE SCHWEBEL AND GERALDINE SCHWEBEL, HIS WIFE; FRANK BAPTISTE AND CATHERINE BAPTISTE, HIS WIFE, AND EDWARD B. AGAR AND EILEEN AGAR, HIS WIFE, PLAINTIFFS-RESPONDENTS,
v.
E.I. DU PONT DE NEMOURS AND COMPANY; WILLIAM E. NEELD, JR., M.D., AND G.F. REICHWEIN, M.D., DEFENDANTS-APPELLANTS, AND JOHNS-MANVILLE CORPORATION; OWENS-ILLINOIS, INC.; OWENS-CORNING FIBERGLAS CORPORATION; KEENE CORPORATION; CELOTEX CORPORATION; RAYBESTOSMANHATTAN CORPORATION; SEPCO CORPORATION; AMATEX CORPORATION; PHILIP CAREY COMPANY; UNITED ASBESTOS AND RUBBER COMPANY, A/K/A UNARCO; ARMSTRONG CONTRACTING AND SUPPLY CORPORATION; ACANDS INDUSTRIES, INC.; BIRD AND SONS, INC.; EAGLE-PICHER INDUSTRIES, INC.; FIBERBOARD CORPORATION; FIBERBOARD CORPORATION, PABCO DIV.; FORTY-EIGHT INSULATIONS, INC.; CHILDERS PRODUCTS COMPANY; GAF CORPORATION; PITTSBURGH CORNING CORP.; H.K. PORTER COMPANY; ROCK WOOL MANUFACTURING COMPANY; PHILADELPHIA ASBESTOS CORPORATION, D/B/A PACOR, INC.; SOUTHERN ASBESTOS COMPANY; DELAWARE INSULATION COMPANY; ARMSTRONG WORLD INDUSTRIES, INC.; GARLOCK, INC.; J.W. ROBERTS, LTD., A DIVISION OF TURNER & NEWALL, LTD.; JOHN DOE CORPORATIONS (1-47); ALBINAS SMULKSTYS, M.D.; JOHN DOE(S), M.D., AND RICHARD ROE, M.D., DEFENDANTS.
Superior Court of New Jersey, Appellate Division.
Argued May 31, 1988.
Decided July 22, 1988.
*576 Before Judges DREIER, BAIME and ASHBEY.
Thomas L. Morrissey argued the cause for appellants (Carpenter, Bennett & Morrissey, attorneys; Thomas L. Morrissey and Rosemary Alito, of counsel; Silvio J. DeCarli and Kevin P. Duffy, on the brief).
David Jacoby argued the cause for respondents (Tomar, Seliger, Simonoff, Adourian & O'Brien, attorneys; David Jacoby, Joshua M. Spielberg and Esther Berezofsky, on the brief).
The opinion of the court was delivered by ASHBEY, J.A.D.
This appeal arises out of a Law Division trial following a remand from the Supreme Court. See Millison v. E.I. du Pont de Nemours & Co., 101 N.J. 161 (1985). There the Court held that the New Jersey Workers' Compensation Act, N.J.S.A. 34:15-1 et seq, precluded plaintiffs from maintaining a separate tort action against their employer E.I. du Pont de Nemours and Co. (du Pont) and its physicians for failure to warn plaintiffs of the known risks of asbestos and their resulting asbestos-related medical conditions. The Court further held, however, that the exclusive remedy of N.J.S.A. 34:15-8 did not bar plaintiffs' tort claims for aggravation of those conditions, to the extent that such aggravation resulted from defendants' fraudulent concealment of them.
Following a five-week trial concerning those claims, a jury rendered verdicts in plaintiffs' favor;[1] the jury awarded compensatory damages for the following asserted periods of concealment as follows:

*577
Plaintiffs Amount Against Asserted period of
 Defendants Concealment by defendants
 as stipulated
William Millison $25,000 du Pont and 1974-1979
Marie Millison 6,250 Dr. Neeld
(per quod)
Edward Agar 20,000 " " 1975-1979
Eileen Agar 5,000
(per quod)
Vernon Kronmaier 60,000 du Pont and 1965-1977
 Dr. Reichwein
Dorothy Kronmaier 15,000 " "
(per quod)
Susan Schwebel 20,000 " " 1971-1975
(as executrix of
the estate of
Harold Schwebel).
Clarence Schwebel 10,000 " " 1976-1978
Geraldine Schwebel 2,500
(per quod)
Frank Baptiste 15,000 " " XXXX-XXXX-XX
Catherine Baptiste 3,750

The jury awarded punitive damages of $200,000 respecting each plaintiff employee. Total damages awarded were $1,382,500.
Defendants' motions for judgment n.o.v. or, alternatively, for a new trial, were denied. Defendants appeal from the ensuing judgment and from the denial of their motions, contending that the verdicts were unsupported by the evidence, and were the product of improper evidentiary admissions.
Plaintiffs are all past or present employees at two du Pont New Jersey plants, Chambers Works and Repauno. Each plant contained extensive piping which was insulated with asbestos-containing material. Millison, Agar, C. Schwebel and H. Schwebel worked as pipecoverers or "laggers," installing and removing pipe and tank insulation. Kronmaier and Baptiste were pipefitters. They installed, repaired and removed the underlying pipes. In so doing, they removed old insulation from pipes. *578 Each plaintiff, therefore, worked with and around asbestos-containing material on a frequent basis during relevant time periods. Each plaintiff received annual or semi-annual physical examinations and chest x-rays from du Pont's doctors. Each received notices from these doctors describing the state of his health following these examinations. At relevant times defendant Dr. Neeld was the medical director at Chambers Works and defendant Dr. Reichwein was a plant doctor at Repauno.
Plaintiffs proffered three experts at trial. Dr. Joseph Wagoner, an expert in epidemiology and in the development of knowledge of asbestos-related diseases; Dr. Auerbach, an expert in asbestos-related disease, and Dr. Sokolowski, an expert in pulmonary medicine. Dr. Miller, an expert in radiology, and Dr. Epstein, an expert in pulmonology, were the only witnesses for defendants. All of the experts acknowledged that, judged by modern medical knowledge, plaintiffs' past x-rays demonstrated asbestos-related conditions. The most common symptom was thickening of the pleura, or membrane covering the surface of the lung. Plaintiffs' experts testified that evidence of pleural thickening (or pleural plaque if localized) in plaintiffs' x-rays at relevant times should have alerted defendant doctors to the presence of asbestos-related conditions and that continued exposure to asbestos aggravated the condition. Defendants' experts, on the other hand, said that evidence of pleural changes did not justify a diagnosis of an asbestos-related condition at relevant times. It was Miller's opinion that, although many radiologists knew in the 1950s that asbestos exposure caused interstitial lung disease, radiologists did not associate pleural plaque or thickening with asbestos exposure until 1977 and 1978. Defendant's experts further gave the opinion that, once an asbestos-related condition was incurred, deterioration was inevitable and not related to further exposure. That underlying difference of expert opinion was related to each plaintiff's particularized claim.

*579 William Millison

William Millison was employed almost continuously at du Pont's Chambers Works plant from 1953 to the time of trial. Millison's 1974 du Pont x-rays demonstrated to the experts asbestos-related changes if judged by 1987 medical knowledge. He worked under further asbestos exposure between 1974 and 1979. Following each du Pont physical examination, he, in accord with undisputed du Pont procedure (applicable to all plaintiffs), received written notice that he suffered from no relevant medical problem and was fit for continued asbestos-related work.
In 1979, du Pont sent Millison's x-ray history to be read by outside radiologist specialists.[2] Three months after these 1979 x-rays, du Pont scheduled Millison for additional x-rays at the request of the outside radiologist. Millison testified that this made him suspicious that du Pont was hiding something from him. He therefore consulted his own pulmonary specialist, Dr. Morowitz, who informed Millison that he had asbestosis and advised him not to work in any asbestos environment. At Neeld's request, Neeld and Millison met. When Millison told Neeld what Morowitz said, Neeld said that Millison did not have asbestosis because he did not have all the "symptoms." Neeld refused to recommend that Millison be removed from his work assignment so long as he used available protective equipment. Millison testified that when he asked for a transfer, Neeld said "If I do it for you, I've got to do it for everybody." Millison testified, "He told me that the company was going to take care of me. So when I asked him how they were going to take care of me, ... he said the company was going to pay my burial expenses." Neeld's August 13, 1979 letter identified Millison *580 as having "benign asymptomatic abnormalities" based upon pleural thickening "as identified in May 1979." He there described Millison as a "lifetime ... lagger [who] had the probability of exposure to asbestos." [emphasis added].[3]

Frank Baptiste
Baptiste worked at du Pont's Repauno plant from 1951 until his retirement in 1980, but was not exposed to asbestos after 1972 or 1973. In May 1951, du Pont's Dr. Zahn (not a defendant) noted several abnormalities in Baptiste's pre-employment x-ray (enlarged hilus shadows on both lungs and increased parenchyma markings). According to du Pont records, Zahn did not find any active pathology and approved Baptiste as an employee. In 1976, defendant Reichwein's records described these abnormalities as "unchanged for several years." According to plaintiffs' experts, Baptiste's 1970 x-rays revealed asbestos-related disease.
In April 1979, Baptiste pulled a chest muscle and his family doctor (Dr. Valecchi) referred Baptiste to a pulmonary specialist, Dr. Joseph Sokolowski, who, in May 1979, found a "restrictive ventilatory defect, consistent with asbestos exposure." Baptiste testified that when he asked his supervisor, John Davis, why he wasn't told of his condition, Davis stated, "What the hell good would it do you?"

Edward Agar
Agar worked at the Chambers Works plant from 1961 to his retirement in 1985, save for a period in 1965. Agar's February 1975 x-ray showed pleural plaque and pleural thickening. He continued to be exposed to asbestos between 1975 and 1979. On February 15, 1979, defendant Neeld, in response to a request concerning whether Agar's medical record demonstrated any pulmonary problems, noted in Agar's medical records, "He has none." According to Neeld's records, he recommended, *581 however, an updated physical, because the last one was received in July 1977. Following receipt of Agar's April 3, 1979 x-ray analysis from Drs. Allen and Oglesby, his records were sent to the outside specialist, Dr. Egoville. Following June of 1979 x-ray analysis identifying calcifications as "consistent with changes which could be due to previous exposure to asbestos or other irritant materials," Neeld wrote in Agar's medical record that he told Agar that "we do not identify any `abnormal physical findings.'" After receiving Dr. Egoville's report, however, du Pont characterized Agar's case as one of "asbestos-related benign symptomatic illness."
Agar testified that, when he attended a safety meeting in February 1979, he found the cigarette smoke unbearable, so he left. Neeld refused to excuse him. Neeld told the general foreman that he had no pulmonary problems and he was suspended for two and one half days without pay for leaving a meeting without permission. His April 1979 annual physical was followed by a card saying that "there was nothing wrong with me". He said he had complained of chest pains to du Pont beginning in 1970.

Clarence Schewebel
C. Schwebel worked almost continuously at the Repauno plant from 1951 to the trial date. Pleural thickening was evident in his 1973 x-ray; 1976 x-rays showed "quite apparent pleural changes" and the 1977 x-rays were "obviously not normal." C. Schwebel was further exposed to asbestos between 1976 and 1978. In 1978, C. Schwebel's daughter, a respiratory therapist, heard noises in his chest and advised him to see his family doctor, Dr. Brower, who took x-rays and informed C. Schwebel that he thought that he had asbestos-related disease. C. Schwebel was also referred to Dr. Egoville in May 1978. Dr. Egoville made a presumptive diagnosis of asbestosis. C. Schwebel then confronted defendant Reichwein with this information. C. Schwebel testified that Reichwein denied that he had visible asbestosis, but said, "you got it from *582 the coal mine or you got it from the rock quarry or you had pneumonia."[4] According to medical records, Reichwein advised C. Schwebel that, while the reports were consistent with asbestosis, they were not specifically diagnostic of asbestosis.

Vernon Kronmaier
Kronmaier worked at the Repauno plant from 1951 to October 1981, when he took a disability pension (for apparently unrelated reasons). He ceased working as a pipefitter in 1977, when he asked to be transferred to light duty. Kronmaier's 1965 x-rays showed pleural plaque and thickening in the left mid-lung field, a condition unchanged in the 1966 and 1968 x-rays. He was exposed to asbestos from 1965 to 1977.

Harold Schwebel
H. Schwebel worked at the Chambers Works plant from 1946 to 1948, again from 1950 to 1951, and then almost continuously at the Repauno plant from 1951 until he retired in 1976. He stopped working with asbestos, however, in 1975. H. Schwebel died on March 21, 1984, of cancer (not claimed in this litigation to be caused by defendants). Pulmonary changes were visible in H. Schwebel's 1965 x-rays, although there was evidence that the changes could be attributed to non-asbestos-related causes. His expert testified, however, that in H. Schwebel's 1971 x-rays, pleural changes appeared asbestos-related. H. Schwebel was exposed to asbestos between 1971 and 1975. Du Pont's 1966, 1967, 1968, 1969 and 1972 medical reports listed abnormalities in H. Schwebel's x-rays, but attributed them to "old inactive lung disease". At deposition H. Schwebel said that defendant Reichwein told him he had an asbestos-related condition before his retirement (not indicated in the record as asbestos-related). Miller testified that calcifications in H. Schwebel's lungs, visible in 1971, should be attributed to tuberculosis.
*583 We have earlier noted the nature of the expert testimony. In addition to the expert opinion concerning what defendants should have known, plaintiffs proffered considerable evidence of corporate knowledge from corporate records. In 1964, Dr. Gordon Stopps (then chief of physiology at du Pont's Haskell laboratory)[5] attended an international conference held by the New York Academy of Sciences on the biological effects of asbestos. Stopps prepared a report which he forwarded to Dr. J.A. Zapp, Director of the laboratory, and to Dr. C.A. D'Alonzo, du Pont's corporate Medical Director. Stopps recommended pulmonary function testing for "all workers exposed to a definite [asbestos] risk," including those installing and ripping out insulation, based on du Pont's use of "roughly 200,000 pounds of pipe insulation" of which "70 per cent" was asbestos.
A copy of Stopps' 1964 report went to each du Pont plant physician, and by further memo (dated November 12, 1964), Stopps informed D'Alonzo of his intention to examine the health records of insulation workers at the Chambers Works plant. There followed extensive correspondence between Stopps and du Pont plant medical personnel concerning the very long incubation period of asbestosis, the need to identify exposed workers and how to monitor their health. (In June of 1966 Stopps urged that all pipe insulation workers wear respirators.) There was correspondence between Stopps and D'Alonzo on the need for corporate funds to pursue the study of existing personnel health. His suggested sample review of Chambers Works employees was conducted by Haskell's Dr. Mary Maxfield *584 who made a report in August of 1966. She reviewed the physical examination cards and x-rays of 52 pipecoverers (presumably including Millison and Agar, in accord with Neeld's simultaneous analysis). Her analysis of the 1955-1966 x-rays at Chambers Works categorized the workers by observable conditions, including pleural thickening, fibrosis, emphysema, bronchiectasis, atelectasis, pneumoconiosis and tuberculoma. This report was sent to Neeld. Stopps wrote Neeld that, "While it would appear that there is no cause for concern as to an undue incidence of cancer among these workers, any other conclusion would be of doubtful validity until more data are obtained." Stopps recommended a corporate meeting to "work out a plan."
Maxfield's 1966 report to Stopps, among other medical literature, precipitated an October 25, 1966 meeting of medical executives of du Pont which Stopps arranged. Neeld attended that meeting. Stopps memorialized the October 25, 1966 meeting's purpose, which was to formulate an asbestos strategy with the corporation's medical officials, including a plan to compare the medical records of asbestos-related employees with non-asbestos-related employees, to develop a registry of all such workers and to develop pulmonary function tests to become part of the annual physical examination for targeted workers. Stopps also mentioned funding as a problem, although a small one, when compared with the risk to health and the risks of worker suits. In November 1966, D'Alonzo wrote to all plant physicians that a pilot study concerning pulmonary tests was being implemented at the Chambers Works plant under the guidance of a pulmonary specialist from the Ohio State University Medical Center. Plant physicians were advised not to buy expensive equipment or initiate "any definitive program until recommendations [were] received." In February 1967, however, Stopps wrote, "Certain of the proposals made at [the October 25] meeting are being carried out ..., but in general the medical recommendations have not been implemented." He noted that past incidence of cancer did not adequately reflect the current *585 problem to the exposed population because of the long incubation period of asbestos-related conditions. He urged that the "exposed population" be monitored. In May 1970, du Pont held a company-wide conference on the potential health hazards of asbestos, expressly excepting the question of compensation of employees. Stopps identified an August 1970 set of guidelines which spoke of informing employees who worked with insulation about potential health problems. Stopps left du Pont in 1971.
A second company-wide conference was held in June 1972, and a third in May 1974. On the 1972 agenda was the topic of medical surveillance of asbestos workers. (The 1974 conference was intended, in part, to educate management concerning compliance with the recently enacted Occupational Safety and Health Act and the recent standards on asbestos promulgated by the United States Department of Labor.)
It was undisputed that these conferences resulted in various company changes: the use of procedures for controlling dust and meetings with plant employees concerning the use of safety devices and practices. Millison testified that in 1977 he attended a meeting where employees were instructed on safety procedures and the use of safety equipment, but it was not until 1980 that he was informed of the dangers of asbestos. Millison further testified that employees installing or removing asbestos were not required to wear respirators until the "late 1970s" and prior to that time very few respirators were available for those who desired to wear them (two or three for approximately 100 employees). Kronmaier testified that he was never given a respirator nor any safety instructions (he stopped pipefitting in 1977). C. Schwebel testified that respirators were not required until the "later years" and only when one was in the "saw room" (a room sectioned off from the plant in later years for sawing asbestos blocks). Masks[6] were available *586 prior to this time, but they, as well as respirators, were ineffective because of the lack of a "good seal." C. Schwebel said he complained about this but nothing was done. Agar also testified that respirators were not required until the late 1970's. Agar further testified that in the mid-to-late 1970's, safety procedures were imposed, such as wearing certain clothing, wetting down a dusty area, etc. Baptiste (who was not exposed to asbestos after 1972) testified that he was never required to wear a respirator. He admitted attending safety meetings concerning dust exposure in 1973 or 1974.
The only evidence presented by defendants concerning their communications to plaintiffs about asbestos was a 1977 memo on removal of asbestos-containing insulation and a 1976 film on the use of respirators. No du Pont executive, medical or otherwise, testified.
Defendant Neeld, who was introduced to the jury at opening, but who did not testify, was Medical Director of the Chambers Works plant (where Millison and Agar were employees) at all relevant times. Plaintiffs conceded that, as Medical Director, Neeld was rarely personally involved in the individual medical exams of plant employees, but as Director, he reviewed the reports, received the 1964 and 1966 memos and attended the 1966 meeting. Prior to the October 1966 meeting, on August 19, 1966, Neeld responded to D'Alonzo's inquiry (initiated by Stopps) to review Chambers Works employees' records for possible exposure to asbestos. Neeld said he reviewed the medical files of the 56 pipecoverers, including Millison and Agar, and found only one man with pulmonary disease (not a plaintiff). His 1966 report reads as follows:
Presently, we have 56 employees whose job classification is pipecoverer or lagger (Addendum #2). Their medical classification is as follows:
 Class I - 45 [Including Millison and Agar]
 Class II - 10
 Class III - 1
*587 Of these, only one, a Class II man ... has any pulmonary disease. He has no work restrictions. His diagnosis is pulmonary fibrosis with compensatory emphysema and it is known to be nonoccupational in origin. A review of the records of the remaining men show x-ray findings which describe `mild parenchymal changes consistent with early fibrosis.' Of course, this minor degree is often subjective and based on the feelings of the physician describing the x-ray.
On December 9, 1966, defendant Neeld responded to D'Alonzo's follow-up request for the numbers of any employees who had experienced asbestosis, mesothelioma or carcinoma. His reply was "0."[7] He said that his records showed only one pipefitter dying between 1950 and 1966, for pulmonary reasons.
In a June 12, 1972 memo, Neeld stated,
... In 1968 I undertook an indepth study of the problem [asbestos exposure] and of our experience on Chambers Works.
My conclusions then parallel my belief now and that is that Chambers Works has no health problem as it relates to asbestos.... [T]here were no deaths in any workers for lung reasons who had ever been laggers or construction employees whose work exposure might occasionally be around asbestos.
Of all the 85 cases of cancer of the lung there is not a single case of the cancer category mesothelioma which purportedly is caused by asbestos.[8]
Reichwein, who was also introduced to the jury, but who did not testify, was a physician at the Repauno plant at all relevant times, where C. Schwebel, Baptiste, Kronmaier and H. Schwebel worked. Reichwein personally reviewed x-rays of these four plaintiffs. He reviewed Kronmaier's annual and semi-annual x-rays from 1966 through 1978; he reviewed the annual and semi-annual x-rays of H. Schwebel from 1966 to 1975; he reviewed Baptiste's annual and semi-annual x-rays from 1966 to 1976, and he reviewed C. Schwebel's annual x-rays from 1967 to *588 1978, each time stamping the record, "there is no evidence of active cardiac or pulmonary pathology."
Between July 1978 and March 1979, OSHA investigated du Pont's Repauno plant, and cited du Pont for non-compliance with asbestos regulations.
Defendants first assert that the verdict was not supported by the evidence. Plaintiffs concede that they were required to prove "aggravation of [occupational-disease] illnesses resulting from defendants' fraudulent concealment of already-discovered disabilities" (Millison, supra, 101 N.J. at 166) and that, "[p]roofs that the doctors negligently misdiagnosed plaintiffs' x-rays or estimated poorly concerning the seriousness of plaintiffs' maladies [would] be insufficient to establish a cause of action outside the Compensation Act." Id. at 183. Plaintiffs acknowledge that they had the "unenviable burden of proving a deliberate corporate strategy to conceal plaintiffs' asbestos-related diseases that were discovered by defendants-doctors in corporate physical examinations." Id. at 183. This was the burden which was charged to the jury and against which the proofs must be measured.
The following proofs were virtually undisputed: (1) each plaintiff evidenced symptoms of an asbestos-related condition during his du Pont employment between 1965 and 1979; (2) none was informed of his symptoms until 1978 or 1979, after OSHA conducted its investigation (except H. Schwebel, retired); (3) du Pont management and physicians, including defendant doctors, knew of the dangers of prolonged asbestos exposure and its relationship to pulmonary disease as early as the 1960s, yet they gave targeted employees (known to them) minimal information concerning those risks beginning only in the mid to late 1970s; (4) defendant doctors either examined or reviewed the x-rays of each plaintiff, knowing each was vulnerable, after each evidenced an asbestos-related condition and after the symptoms shown were referred to in du Pont studies, including some of the same employees; (5) each plaintiff was continually *589 advised by defendants that he had no relevant health problems and returned to work for du Pont in the asbestos environment, and (6) no responsible corporate official or doctor denied individual or corporate knowledge respecting a medical understanding of the significance of plaintiffs' x-rays at relevant times. While du Pont did dispute that plaintiffs had established that their conditions worsened after defendant doctors assured them of their health and they continued to be exposed to asbestos, there was contrary evidence.
It is well settled that a conspiracy can be proved by circumstantial evidence alone, because rarely will there be direct evidence. See Interstate Circuit, Inc. v. United States, 306 U.S. 208, 221, 59 S.Ct. 467, 472, 83 L.Ed. 610, 617 (1939); U.S. v. Trotter, 529, F.2d 806 (3d Cir.1976); State v. General Restoration Co., 42 N.J. 366, 375 (1964); State v. Sherwin, 127 N.J. Super. 370 (App.Div. 1974), certif. den. 65 N.J. 569 (1974), petition dism. sub. nom., Loughran v. N.J., 419 U.S. 801, 95 S.Ct. 9, 42 L.Ed.2d 32 (1974). The evidence need not lead to certainty, as long as the inferences drawn are "grounded in a preponderance of the probabilities according to the common experience of mankind." Joseph v. Passaic Hospital Ass'n, 26 N.J. 557, 575 (1958). The inference cannot be mere guess or conjecture. It must be grounded in logic. Ibid. The line between the two is often difficult to draw and is, of course, a decision to be made by the trier of fact. Ibid. In the absence of any contrary testimony concerning defendants' asserted knowledge and concealment, the jury was free to treat silence as evidence. Baxter v. Palmigiano, 425 U.S. 308, 96 S.Ct. 1551, 47 L.Ed.2d 810 (1976); Mahne v. Mahne, 66 N.J. 53, 60 (1974).
Respecting the individual defendants, plaintiffs assert that defendant Neeld was responsible, if at all, under the doctrine of respondeat superior because he conducted no actual review of the x-rays. As noted, Neeld did not testify. The jury was instructed to find against him, however, only if he had *590 actual knowledge of plaintiffs' conditions and conspired to keep that information from them. We thus find Neeld's reliance upon Wirth v. Gabry, 122 N.J.L. 95 (E. & A. 1939) and Little v. Caterpillar Tractor Co., 169 So.2d 654 (La. App. 1964) misplaced.
In addition to challenging the sufficiency of evidence of individual and corporate knowledge, defendants contend that there was no evidence that plaintiffs' initially-contracted asbestos-related conditions were aggravated by workplace exposure during the period of alleged concealment. Alternatively, they urge that, if evidence of aggravation existed, it was insufficiently quantified. In support of that contention, defendants argue that plaintiffs' experts' testimony to that effect constituted "net opinions." See Buckelew v. Grossbard, 87 N.J. 512, 524 (1981). We disagree. We find defendants' reliance upon Ayers v. Jackson Tp., 106 N.J. 557 (1987) misplaced. In Ayers, the court refused to recognize a cause of action for the unquantified enhanced risk of a disease which had not occurred, and which might never occur. Id. at 597-598. In so holding, the court distinguished the problem of quantifying an injury for an intentional tort representing an injury that had occurred and could be proven at trial. Id. at 597.
The scope of review in a challenge to a jury verdict as being against the weight of the evidence is limited to a determination of whether the verdict resulted in a miscarriage of justice. R. 2:10-1; Carrino v. Novotny, 78 N.J. 355, 360-361 (1979); Baxter v. Fairmont Food Co., 74 N.J. 588, 599 (1977); Dolson v. Anastasia, 55 N.J. 2, 6-8 (1969); Pekter v. Price, 206 N.J. Super. 355, 357 (App.Div. 1985). While an appellate court must make its own determination whether there is a miscarriage of justice, and defer to the trial judge only with respect to those "intangible aspects" such as witness demeanor and the "feel of the case," Rivera v. Westinghouse Elevator Co., 209 N.J. Super. 543, 548 (App.Div. 1986), aff'd. as mod. 107 N.J. 256 (1987), "a jury verdict is impregnable, unless so distorted and *591 wrong, ... as to manifest with utmost certainty a plain miscarriage of justice." Carrino, supra, 78 N.J. at 360. Our careful review of the record persuades us that the verdict was supported by the evidence and we have no warrant to disturb it.[9]
We now turn to the real and troublesome issue in the case: the improper admission of the OSHA citations as substantive evidence. In August of 1978, OSHA investigators Vincent Gallagher and Myra Hess were sent to the Repauno plant (at the insistence of the employees' union) to investigate a complaint of chemical exposures to the employees. Gallagher testified that, while he was at the plant, Union President Watson told him of employee complaints of unsafe work conditions due to asbestos. Gallagher returned for a few more visits and said he observed "tons of asbestos insulation on miles of pipe as well as other heat generating equipment." Samples of insulation were tested by OSHA. At the request of OSHA, Repauno plant employees' x-rays and medical histories were reviewed by a doctor from the University of Pennsylvania, and Chambers Works plant employees' x-rays and medical histories were reviewed by Dr. Miller (who testified for defendants).
As a result of the information collected, Gallagher participated in the writing of a report which was submitted to his supervisors, and which, in turn, resulted in the issuance of OSHA citations against du Pont on April 13 and 16 of 1979. The citations charged that du Pont had "willfully" violated the law. One page read that:
(a) Employer [du Pont] failed to correlate the available medical data of the x-rays and pulmonary function tests. This data, concerning pulmonary and radiological changes, gives evidence of seven cases of pleural thickening and two cases of asbestosis. The nine insulators involved were not notified by employer of their medical conditions.
(b) The administration and organization, within employer's management hierarchy, did not insure that medical data was competently evaluated and reviewed, *592 and in addition, did not ensure that effective treatment or preventative action was taken when warranted.
Pursuant to 29 U.S.C.A. sec. 659(a), du Pont contested the citations with the Department of Labor, resulting in a settlement which eliminated the "willful" designation, and provided that the alleged violations had been abated. The stipulation further provided:
That the Citation and Notification of Penalty, Complaint, Answer, Stipulated Settlement, Respondent's Notice of Contest, Respondent's withdrawal of its Notice of Contest, Respondent's failure to continue to contest, Respondent's abatement of the alleged violations, Respondent's payment of any penalty and the Commission's Final Order entered herein shall not constitute any evidence or admission upon the part of Respondent, or be admitted into evidence, in whole or in part, in any proceeding or litigation in any court, agency or forum, except in proceedings brought directly under the Act by the Secretary, inasmuch as the contents of the Stipulated Settlement are for the exclusive benefit of the parties hereto; nor shall they constitute an admission upon the part of Respondent that any of the conditions alleged in the Citations or Complaint existed or were the cause, or a cause proximate or otherwise, of any accident, or damages, if any, resulting therefrom.
Plaintiffs-employees' union, represented by plaintiffs' attorneys, objected to this language. They petitioned the Occupational Safety and Health Review Commission (OSHRC) for a discretionary review.[10] On February 13, 1981, OSHRC affirmed the settlement as written. No appeal was filed.
Before trial, defendants moved to bar "(1) all documents and/or testimony regarding the administrative proceedings conducted by [OSHA] with respect to du Pont's Repauno ... and Chambers Works... plants and (2) the testimony ... and/or all reports authored by ... [OSHA investigators and/or agents]." The judge ruled that the texts of the citations, although hearsay, *593 were admissible as official documents under Evid.R. 63(15). He further said that the citations were tantamount to a "workplace survey" under the Worker and Community Right to Know Act, N.J.S.A. 34:5A-16. The judge ruled, however, that the terms of the settlement itself were inadmissible.
As a result of this ruling, many trial references were made to the fact that du Pont had been cited by OSHA. The citations themselves were admitted into evidence. No instruction limiting their use was requested by defendants nor given to the jury.
There can be no question that the OSHA citations were hearsay. Evid.R. 63; State v. Johnson, 216 N.J. Super. 588, 600 (App.Div. 1987), and were improperly admitted under Evid.R. 63(15), which provides:
... [A] statement is admissible if in the form of (a) a written statement of an act done, or an act, condition or event observed by a public official if it was within the scope of his duty either to perform the act reported or to observe the act, condition or event reported and to make the written statement, or (b) statistical findings made by a public official whose duty it was to investigate the facts concerning the act, condition or event and to make statistical findings.
The citations neither contained a report nor were they the finding of a public official. Although based on Gallagher's report (not in evidence), they were signed by OSHA Area Director Harry D. Allendorf, who observed nothing. Any relevant underlying medical reports were prepared by doctors who were consultants, not "public officials," see Evid.R. 62(3). Most important, the citations were unsubstantiated charges of law violation. Defendants correctly compared them to an arrest record.
The Occupational Safety and Health Act (The Act) of 1970 was designed to insure safe and healthful working conditions in employment (29 U.S.C.A. sec. 651(b)), in part by authorizing the Secretary of Labor to set safety standards and by creating a review commission to adjudicate disputes (29 U.S.C.A. sec. 651(b)(3)). See also Taylor Diving and Salvage Co., Inc. v. U.S. Dep't of Labor, 599 F.2d 622 (5th Cir.1979). Section 658(a) *594 of the Act mandates the Secretary of Labor to issue citations if upon inspection or investigation he believes that an employer has violated any standard, rule or order promulgated under the Act. If the employer doesn't contest the citation within 15 days of its issuance, it is deemed a final order of the Commission and not subject to review by any court or agency. 29 U.S.C.A. sec. 659(a).
It is well settled that the OSHA regulations were intended neither to create nor to destroy common law rights and liabilities of employers or employees arising out of employment. 29 U.S.C.A. sec. 653(b)(4); Frohlick Crane Serv. Inc. v. Occupational S. & H.R.C., 521 F.2d 628, 631 (10th Cir.1975); Annotation, OSHA Violation by Employer or Third Party as Providing Cause of Action for Employee, 35 A.L.R.Fed. 461 (1977). The Act was intended to be preventive, B & B Insulation, Inc. v. O.S.H.R.C., 583 F.2d 1364, 1371, 1371 n. 11 (5th Cir.1978), by creating employer compliance through sanctions. Johnson v. Koppers Co., Inc., 524 F. Supp. 1182, 1189 (N.D. Ohio 1981), app. dism. 705 F.2d 454 (1982). While OSHA regulations may be admissible to establish a standard of care, see Dixon v. International Harvester Co., 754 F.2d 573, 581, 581 n. 5 (5th Cir.1985); Annotation, Violation of OSHA Regulation as Affecting Tort Liability, 79 A.L.R.3d 962 (1977), OSHA citations are the opinions of investigators and ordinarily do not "carry with [them] the indicia of reliability that is inherent in government adopted safety standards." Dixon, supra, 754 F.2d at 581 n. 5.[11]
*595 In Phillips v. Erie Lackawanna R.R. Co., et al., 107 N.J. Super. 590, 594-601 (App.Div. 1969), certif. den. 55 N.J. 444 (1970), we noted that "conclusionary material resulting from official investigations embodied in statements or reports of the official or agency involved," are not evidentiary. Id. at 595. Plaintiffs' reliance on State v. Moore, 158 N.J. Super. 68 (App.Div. 1978) is misplaced. We there held that the report at issue would be admissible, if at all, as the best available secondary evidence under Evid.R. 70. Id. at 77-78. We expressly refused to rule on the admissibility of the report under Evid.R. 63(15).
Nor were the citations admissible as a business entry under Evid.R. 63(13). While "business" includes governmental activity, Evid.R. 62(5), a report is not admissible simply because it was made in the regular course of a business, government or otherwise. See Brown v. Mortimer, 100 N.J. Super. 395 (App. Div. 1968). The report must be otherwise reliable. See McCormick supra, sec. 308 at 877. As noted, this was not a report. Reasons for excluding factual conclusions derived from investigatory proceedings under Evid.R. 63(15), apply equally under Evid.R. 63(13) see Phillips, supra, 107 N.J. Super. at 594.[12]
The judge cited the Supreme Court's referral to the Worker and Community Right to Know Act, N.J.S.A. 34:5A-1 et seq. (see Millison v. E.I. du Pont de Neumours & Co., supra, 101 N.J. at 180).[13] Providing employees with rights to inspect their workplace surveys, however, did not authorize the use of such *596 surveys to prove the ultimate issue before the jury and we do not surmise that the Supreme Court intended otherwise.
Although the citations were improperly before the jury, we are nonetheless constrained to view the error as harmless. R. 2:10-2; State v. Macon, 57 N.J. 325, 338-340 (1971). In Meadoux v. Hall, 369 So.2d 240 (La. Ct. App. 1979), writ den. 369 So.2d 1366 (1979), plaintiffs' counsel referred to an OSHA investigation and the resulting citations, including a reference to a finding of guilt and payment of fine. The court held that the improper admission was harmless because the trial judge instructed the jury that the fine was paid based on an administrative decision that it would be cheaper to pay it than contest it. He further instructed that the fine was paid without admission of guilt. Id. at 245.
In Lenoir v. C.O. Porter Machinery Co., 672 F.2d 1240, 1247-1248 (5th Cir.1982), the court held that the admission of an OSHA citation as evidence of negligence was harmless error, as it merely tended to prove that a particular area of the plant was safe because it was not included. In Dixon v. Internat'l Harvester Co., supra, the court stated that if evidence of a violation of an OSHA regulation proffered against a defendant who was not the employer was error, it was harmless because of other overwhelming evidence. 754 F.2d at 582.[14]
There can be no question that Gallagher's relevant testimony concerning what he saw and what the employees complained to him about was admissible, because the evidence related to what du Pont knew, and when it first learned what it knew. Millison's 1979 du Pont employment record contained the words, "do *597 not enter on OSHA log," and OSHA advised plaintiffs of their asbestos-related conditions. Defendants' witness was one of the doctors requested by OSHA to review du Pont's medical records. Clearly, certain references to OSHA's involvement were inevitable and proper.
During the trial the judge told the jury:
Members of the jury, prior to the time that you were excused, Mr. Gallagher, the witness presently on the stand, incorporated into an answer the use of the term violations. It's the recollection of the court that this was at or about the time he said he put the data that he collected into a report and it was the impulse of the court at that time to interrupt and correct that term violations and it properly should read ["]alleged["] violations so that you are instructed to accept that phraseology and to put out of your mind the other terminology.
Thus the jury knew the charges outlined in the citation were unproved. Moreover, plaintiffs' counsel limited the use of the citation in his closing argument:
OSHA came on in 1978 and citations were issued, United States Department of Labor, Occupational Safety and Health Act.
Do you know what the real importance of that is, not the citation, not the language, this is evidence.
... [B]ut the importance of this is that this is what  this is how these men came to know that they were sick in each and every case. Some guys, because of fortuitous events like breaking a rib or hearing noises, found out a little sooner.... In each and every case OSHA came on to Repauno in '78 and in Chambers Works in '79.
In the summer of '79 OSHA came on and said let's look at his records. And in July of '79 [Neeld] said I change my mind, you're sick now. What a coincidence.
While the wording of the citation was hearsay, the fact of OSHA's investigation and the timing of the citation was not hearsay. It was admissible for the purpose that plaintiffs asserted, to demonstrate that defendants, who claimed no prior knowledge of plaintiffs' asbestos-related conditions, developed new related policies of employee communication only after OSHA investigated.[15]
*598 The real error was a lack of limiting instruction to the jury under Evid.R. 6. In our view plaintiffs' presentation to the jury compensated for this lack, making the error harmless. R. 2:10-2; cf. Bowers v. Camden Fire Ins. Assoc., 51 N.J. 62 (1968).[16]
In view of the limiting circumstances of the proffer, the failure of defendants to request a limiting charge and the weight of the other evidence, we are persuaded that the admission of one erroneous document among over 5,000 exhibits[17] and 2,700 pages of testimony did not lead to a miscarriage of justice.
The judgment and order appealed from are accordingly affirmed.
NOTES
[1] Plaintiffs' complaints against defendant-manufacturers and suppliers of asbestos listed in the caption were not tried in the Law Division nor are they involved in this appeal. Complaints against du Pont doctor Smulkstys were dismissed at trial.
[2] This referral coincided with similar references in other cases. Du Pont claims this was done pursuant to a new policy. Plaintiffs claim that the new policy was instituted as a direct result of the Occupation Safety and Health Administration (OSHA) investigation of the Repauno plant (7/78 through 3/79).
[3] See infra for the record of Neeld's specific exposure to Millison's asbestos-related work history.
[4] H. Schwebel, not C. Schwebel, had previously worked in a coal mine, and had pneumonia.
[5] Du Pont had its own laboratory created in the 1930's, staffed with scientists, whose function was to study the effects of chemicals on people and animals and to provide support concerning the working environment on the working population. The laboratory was part of the medical department, which was part of the employee relations department. According to Stopps, the purpose of the Haskell laboratories was to "keep abreast of developments as they related to ... physical agents affecting human beings." Among the list of agents that would have been of such interest, "asbestos was reasonably high on the list." Haskell maintained a library of relevant industrial medical publications.
[6] Masks, unlike respirators appeared to have no filter.
[7] Defendant Reichwein made a similar analysis at Repauno.
[8] This 1968 study which is not in the record was probably in response to D'Alonzo's request for a list of employees exposed to asbestos in furtherance of a desire "to keep very close biostatistical studies and surveys on asbestos exposed company employees."
[9] Defendants do not challenge the jury instructions which followed the strict mandates of the Supreme Court.
[10] The question of enforcement of the settlement was left to the State courts. Plaintiffs, of course, were not bound. Subsequently it was ruled that the Commission was without jurisdiction to hear such objections. 29 U.S.C.A. sec. 659(c); Donovan v. International Union, Allied Indus. Workers, 722 F.2d 1415, 1419 (8th Cir.1983). See also Donovan v. Local 962, Intern. Chem. Workers Union, 748 F.2d 1470, 1472 (11th Cir.1984); Donovan v. Oil Chem. and Atomic Workers Intern., 718 F.2d 1341, 1353 (5th Cir.1983), cert. den. 466 U.S. 971, 104 S.Ct. 2344, 80 L.Ed.2d 818 (1984).
[11] As one commentary noted, the issuance of a citation meant little. During the first year after OSHA became effective, 23,230 citations were issued, with proposed penalties totalling $2,291,000, or approximately $98 per citation. Lynn, "The Occupational Safety and Health Act of 1970: Its Role in Civil Litigation," 28 Sw.L.J. 999, 1002 (1974). However, for the first six months, the average final assessments were only $18 per penalty. Ibid. The commentary notes that 95 percent of employers cited paid without protest to avoid a costly administrative battle. Id. at 1013.
[12] Defendants also argue that the citations are inadmissible under Evid.R. 55 which is inapplicable because the conduct referred to in the citations is not conduct on another occasion, but the conduct which is the subject matter of this lawsuit. Defendants' arguments respecting Evid.R. 4 go to the heart of the matter.
[13] The Supreme Court recognized that all applicable sections of that act were preempted by the Act of 1970. It nevertheless referred to it as an exposition of public policy. Millison v. E.I. du Pont de Neumours & Co., supra, 101 N.J. a 180 n. 3.
[14] In Dixon, 754 F.2d at 581, n. 5, the Lenoir rejection of OSHA citation admissibility was distinguished from the propriety of admitting OSHA regulations into evidence. In both cases the Fifth Circuit held the admission harmless error. The Dixon court also noted that the Lenoir court erroneously applied state evidence rules rather than federal rules. We note that under either our Evid.R. 63(15) or the more liberal Fed.Evid.R. 803(8)(C), the citation at issue was inadmissible.
[15] We note that, at trial, defendants did not acknowledge the possible admissibility for a limited purpose of any OSHA related documents or testimony. (When asked by the Court whether he objected to the first admission into evidence of the letter from OSHA to Millison, counsel said, "No. I made my objection to anything OSHA did. I was overruled on that. He [Millison] got this document in '80 or '81. It speaks for itself.")
[16] Cf. also Milton v. Wainwright, 407 U.S. 371, 377, 92 S.Ct. 2174, 2178, 33 L.Ed.2d 1, 6 (1972) (improperly admitted confession given to undercover officer posing as prisoner, harmless error); State v. Lair, 62 N.J. 388, 392 (1973) (failure to give limiting instruction, not requested, on use of evidence of defendant's prior convictions, was harmless error in light of overwhelming evidence); State v. Johnson, 216 N.J. Super. 588, 607 (App.Div. 1987) (failure to give limiting instruction, not requested, concerning use of good character evidence of victim who was the only testifying witness to the assault, harmless error). See also Bruton v. United States, 391 U.S. 123, 135, 88 S.Ct. 1620, 1627, 20 L.Ed. 476, 484 (1968); State v. Rajnai, 132 N.J. Super. 530, 537 (App.Div. 1975).
[17] This is the number of exhibits referred to in appellants' appendix before us. Although the citation included seven pages, only one refers specifically to defendants' willful failure to notify employees of pleural thickening and asbestosis.